FILED
2025 Sep-02 PM 12:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SYLVIA WALLACE, as guardian for CASSIDY S. SHELTON,** | } } } | |
| **Plaintiff,** | } } | |
| **v.** | } } | **Case No.:  5:22-cv-00732-MHH** |
| **FRANK BISIGNANO, Commissioner of the Social Security Administration,**[1] | } } } } } | |
| **Defendant.** | } } } | |

## <u>MEMORANDUM OPINION</u>

Cassidy Shelton, through her guardian and mother Sylvia Wallace, has asked the Court to review an adverse decision of the Commissioner of Social Security. The Commissioner of Social Security denied Ms. Shelton's claims for disabled adult child's insurance benefits and supplemental security income based

---

[1] On May 7, 2025, Frank Bisignano was sworn in as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Commissioner Bisignano as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

1

on the Appeals Council's finding that Ms. Shelton was not disabled.[2] Ms. Shelton argues that the Appeals Council improperly evaluated her treating physicians' medical opinions. Ms. Shelton also argues that substantial evidence does not support the Appeals Council's pain standard finding regarding the limiting effects of her mental and physical impairments. Finally, Ms. Shelton argues that the Appeals Council erred in finding that her mental impairments did not meet a listing. Having reviewed the administrative record, for the reasons discussed below, the Court affirms the Commissioner's decision.

## ADMINISTRATIVE PROCEEDINGS

For adult child's insurance benefits, an adult who has a disability that began before age 22 may be eligible for benefits if the adult's parent is deceased or begins receiving retirement or disability benefits. The SSA "consider[s] this a 'child's' benefit because it is paid on a parent's Social Security earnings record. The Disabled Adult Child (DAC) . . . must be unmarried, age 18 or older, have a qualified disability that started before age 22, and meet the definition of disability for adults." https://www.ssa.gov/benefits/disability/qualify.html (last visited August 15, 2024); s*ee* 42 U.S.C. § 402(d)(1); 20 C.F.R. §§ 404.350, 404.1505(a).

---

[2] Where, as here, the Appeals Council grants review and renders a decision, the Appeals Council's decision is the Commissioner's final decision for purposes of this Court's review. *See* 20 C.F.R. §§ 404.900(a)(4)-(5), 404.981, 422.210.

Ms. Shelton filed for adult child's insurance benefits based on her biological father's Social Security earnings records. (Doc. 6-7, p. 41).

To succeed in her administrative proceedings, Ms. Shelton had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [she] is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[3]

To determine whether a claimant has proven that she is disabled, an administrative law judge—ALJ—follows a five-step sequential evaluation process. The ALJ considers:

> (1)    whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

---

[3] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (last visited August 15, 2024). The definition for disability also is the same for disabled adult child's insurance benefits. *See* https://www.ssa.gov/benefits/disability/qualify.html (last visited August 15, 2024).

can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

On March 8, 2013, Ms. Shelton, through her guardian Ms. Wallace, applied for disabled adult child's insurance benefits and supplemental security income benefits. (Doc. 6-10, pp. 2, 9).[4] In her disabled adult child's benefit application, Ms. Shelton asserted that her disability began on December 1, 2009. (Doc. 6-10, p. 2). In her supplemental security income application, Ms. Shelton asserted that she became disabled on September 25, 2012. (Doc. 6-10, p. 9). The Commissioner initially denied Ms. Shelton's claims, and Ms. Shelton requested a hearing before an ALJ. (Doc. 6-8, pp. 9, 16; Doc. 6-9, p. 16). Ms. Shelton and her attorney attended a hearing with ALJ Randal Stout on February 25, 2014.

---

[4] The record indicates that Ms. Shelton previously applied for disability benefits, and an ALJ denied the application in January 2011 and denied a request for reconsideration in January 2012. (Doc. 6-8, p. 5; Doc. 6-24, p. 7).

(Doc. 6-7, pp. 103-138). Ms. Shelton and Ms. Wallace testified at the hearing. (Doc. 6-7, pp. 111, 130).

ALJ Stout held a supplemental hearing on September 12, 2014. (Doc. 6-7, pp. 61-102). A vocational expert and a medical expert testified at the hearing. (Doc. 6-7 pp. 69, 88, 99). Reportedly because the "recording equipment was not working properly" to record the medical expert's testimony audibly, ALJ Stout scheduled another hearing to examine the medical expert. (Doc. 6-6, p. 33; Doc. 6-11, pp. 58-59).[5] Ms. Wallace objected to subjecting Ms. Shelton to another hearing. (Doc. 6-11, pp. 60-61).

Over Ms. Wallace's objections, ALJ Stout held the third hearing on September 17, 2015. (Doc. 6-7, pp. 53-60). Ms. Shelton, her attorney, and a vocational expert attended the hearing. (Doc. 6-7, p. 53). Ms. Shelton's attorney explained that Ms. Wallace could not attend the hearing, but she requested that ALJ Stout recuse himself. Ms. Wallace felt that ALJ Stout was "prosecuting the case" against Ms. Shelton and that ALJ Stout treated Ms. Wallace and Ms. Shelton "differently from other people." (Doc. 6-7, pp. 56, 58). ALJ Stout did not find grounds for recusal but nevertheless recused from the case after a vocational expert testified about Ms. Shelton's past work. (Doc. 6-7, pp. 57-58).

---

[5] The record contains a transcript of the medical expert's testimony from the September 17, 2015 hearing. (Doc. 6-7, pp. 69-87). The transcript indicates that the medical expert had trouble hearing Ms. Shelton's attorney's questions. (Doc. 6-7, pp. 71-73).

ALJ Lori Williams received Ms. Shelton's case, and ALJ Williams conducted a fourth hearing on December 1, 2015. (Doc. 6-7, pp. 2-51). Ms. Shelton and a vocational expert testified at the hearing. (Doc. 6-7, pp. 13, 44). ALJ Williams recused on December 11, 2015 after she received a letter from Ms. Shelton's attorney which ALJ Williams regarded as "an attack upon [her] overall character and [her] judicial integrity." (Doc. 6-9, p. 132).

When ALJ Cynthia Weaver took over the case in 2016, (Doc. 6-6, p. 35), she referred Ms. Shelton's benefits application to the Cooperative Disability Investigations Unit in Birmingham, Alabama. ALJ Weaver was concerned with "inconsistencies" in Ms. Shelton's "reported function." (Doc. 6-24, p. 7; *see also* Doc. 6-6, p. 35). The CDIU issued its "Summary Report of Investigation" on July 20, 2016 and a supplemental report on August 29, 2016. (Doc. 6-24, pp. 17, 35). On August 17, 2016, ALJ Weaver conducted a fifth hearing in Huntsville, Alabama. (Doc. 6-6, pp. 94-164). Ms. Wallace, a vocational expert, and a medical expert testified at the hearing. (Doc. 6-6, pp. 101, 113, 155).

ALJ Weaver issued an unfavorable decision on October 4, 2016. (Doc. 6-6, pp. 33-80). On February 12, 2018, the Appeals Council granted Ms. Shelton's request for review and found that the ALJ "did not provide an adequate symptom

evaluation in accordance with Social Security Ruling 16-3p." (Doc. 6-5, p. 47).[6] Still, the Appeals Council found that Ms. Shelton was not disabled. (Doc. 6-5, p. 47). The Appeals Council gave Ms. Shelton and her attorney an opportunity to submit a "statement about the facts and law in [the] case or additional evidence" and to ask for an "appearance before the Appeals Council." (Doc. 6-6, p. 48). Ms. Shelton submitted additional statements, but the Appeals Council did not find that the evidence was sufficient to change the decision. (Doc. 6-6, pp. 10-14).

On June 8, 2018, the Appeals Council issued a final unfavorable decision, (Doc. 6-6, pp. 10-14), making the Commissioner's decision a proper candidate for this Court's judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also* 20 C.F.R. §§ 404.900(a)(4-5), 404.981, 422.210.

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Shelton's Medical Records*

To support her application, Ms. Shelton submitted medical records relating to the treatment and diagnoses of Crohn's disease, anemia, post-traumatic stress disorder, anxiety, conversion disorder, dyslexia, memory issues, and schizophrenia. The Court has reviewed Ms. Shelton's complete medical history

---

[6] SSR 16-3p became effective on March 28, 2016 and applied to all ALJ "determinations and decisions on or after" the effective date. *See* https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di-01.html#FN27 (last visited Aug. 15, 2026). ALJ Weaver applied SSR 96-4p in her October 4, 2016 decision. (Doc. 6-6, pp. 39, 80).

and summarizes the following medical records because they are most relevant to the Court's decision in this appeal.

*Physical Impairments*

In March 2009, Ms. Shelton began experiencing upper abdominal pain, "with associated headaches and nausea after switching schools." (Doc. 6-12, p. 66). In November 2009, Ms. Shelton developed diarrhea and lower abdominal pain, nausea, and vomiting. (Doc. 6-12, p. 66). Ms. Shelton, who was 18 years old, was admitted to Huntsville Women's and Children's Hospital on December 3, 2009. (Doc. 6-12, p. 66). A colonoscopy showed "continuous inflammation," and Ms. Shelton received "a long course of IV steroids." (Doc. 6-12, p. 66). She received a diagnosis of inflammatory bowel disease. (Doc. 6-12, p. 66).

On December 11, 2009, Ms. Shelton travelled to the pediatric emergency room at the University of Chicago Medical Center for a second opinion. (Doc. 6-12, pp. 66, 72, 73).[7] An MRI of Ms. Shelton's bowels showed "no focus of restricted diffusion to suggest acute inflammatory process," "no evidence of any significant bowel dilatation to suggest obstruction or stenosis," and "no evidence

---

[7] The notes from this visit indicate that Ms. Shelton had "past developmental delay" and that Ms. Shelton's mother provided most of Ms. Shelton's medical history for the visit. (Doc. 6-12, p. 66). That history included carbon monoxide poisoning in first grade "with some possible residual learning disabilities." (Doc. 6-12, p. 185). The history also states that Ms. Shelton "was a senior in [high school] before she became homebound." (Doc. 6-12, p. 185). Developmental delay is mentioned throughout Ms. Shelton's records from the University of Chicago Medical Center.

of active disease." (Doc. 6-12, p. 74). Ms. Shelton received a Remicade infusion on December 15, 2009 and showed rapid improvement. (Doc. 6-12, p. 68). Ms. Shelton was diagnosed with inflammatory bowel disease and "likely ulcerative colitis." (Doc. 6-12, p. 66).[8] Dr. Adam Kaufman scheduled another Remicade infusion for Ms. Shelton on December 28, 2009 with Dr. Stephen Hanauer. (Doc. 6-12, pp. 68-69).

From May 17, 2010 to February 9, 2011, Ms. Shelton visited University of Chicago Gastroenterology Clinic for follow-up appointments. (Doc. 6-12, pp. 58-65). At a May 17, 2010 visit, Dr. Hanauer wrote that Ms. Shelton's inflammatory bowel disease "likely represent[ed] ulcerative colitis," but he did not rule out Crohn's disease. (Doc.6-12, p. 65). At a July 21, 2010 visit, Ms. Shelton reported that her Remicade infusions usually helped her pain, but her most recent infusion had not helped and caused her to vomit. (Doc. 6-12, p. 62). Dr. Hanauer noted that Ms. Shelton's abdominal pain might be "related to active Crohn's disease,"

---

[8] "Inflammatory bowel disease (IBD) is a term that describes disorders involving long-standing (chronic) inflammation of tissues in your digestive tract. Types of IBD include: [] Ulcerative colitis**.** This condition involves inflammation and sores (ulcers) along the lining of your large intestine (colon) and rectum[; and] Crohn's disease. This type of IBD is characterized by inflammation of the lining of your digestive tract, which often can involve the deeper layers of the digestive tract. Crohn's disease most commonly affects the small intestine. However, it can also affect the large intestine and uncommonly, the upper gastrointestinal tract." *See* https://www.mayoclinic.org/diseases-conditions/inflammatory-bowel-disease/symptoms-causes/syc-20353315 (last visited Aug. 15, 2024).

and she likely had "Crohn's colitis." (Doc. 6-12, p. 63).[9] At a February 9, 2011 visit, Dr. Hanauer noted that Ms. Shelton was "stable for the full eight weeks in between Remicade infusions," she "was able to discontinue corticosteroids," and her "Colonic Crohn's disease" was in remission. (Doc. 6-12, pp. 58-59). Ms. Shelton complained of fatigue. (Doc. 6-12, p. 58). Ms. Shelton requested a referral to a local GI doctor, and Dr. Hanauer referred her to Dr. Wolf at the Atlanta Gastroenterology Clinic in Atlanta, Georgia. (Doc. 6-12, p. 59).

On June 20, 2011, Ms. Shelton presented to the emergency room at St. Joseph's Hospital in Atlanta, Georgia with her uncle. She complained of abdominal pain. (Doc. 6-12, pp. 39-40). Ms. Shelton reported that she had colitis but was unsure if it was Crohn's or ulcerative colitis, that Dr. Wolf was her local gastroenterologist, that she had a colonoscopy in 2010, that she had Remicade infusions every eight weeks, and that she was "not hindered" by colitis. (Doc. 6-12, p. 39). Ms. Shelton stated that she was "not hindered by the colitis." (Doc. 6-12, p. 39). Dr. Stuart Segerman found that Ms. Shelton's abdominal pain was "possibly secondary to a viral syndrome" and did not appear to be an exacerbation of colitis. (Doc. 6-12, p. 40). Dr. Segerman noted that Ms. Shelton was not experiencing depression or anxiety. (Doc. 6-12, p. 39).

---

[9] At this visit, Dr. Hanauer noted that Ms. Wallace was receiving chemotherapy treatments for breast cancer. (Doc. 6-12, p. 62).

Ms. Shelton returned to the gastroenterology clinic in Chicago on January 16, 2012 and reported that she was doing well on her medications, had no abdominal pain, had a good appetite, and did not have "breakthrough symptoms" between Remicade infusions. (Doc. 6-12, p. 54). Ms. Shelton reported that she had extreme fatigue and nausea for a few days after a Remicade infusion. (Doc. 6-12, p. 54). Dr. Hanauer noted that Ms. Shelton's Crohn's disease "appear[ed] to be in deep remission." (Doc. 6-12, p. 55). Dr. Hanauer sent the visit notes to Dr. Wolf. (Doc. 6-12, p. 54, 56). He reported to Dr. Wolf that Ms. Shelton lived in Alabama with her mother. (Doc. 6-12, p. 55).

On February 29, 2012, Ms. Shelton saw Dr. Rajesh Patel at the Center for Colon and Digestive Disease in Huntsville, Alabama for a Remicade treatment. (Doc. 6-13, p. 82). Ms. Shelton reported that she did not have abdominal pain, diarrhea, or gastrointestinal bleeding. (Doc. 6-13, p. 82). Dr. Patel noted that Ms. Shelton had seen Dr. Hanauer and had been "followed by Dr. Wolf in Atlanta and [had] the Remicade treatments there every 8 weeks." (Doc. 6-13, p. 82). Ms. Shelton wanted to have the Remicade treatments in Huntsville because she was in college in Huntsville. (Doc. 6-13, p. 82). Dr. Patel wrote that Ms. Shelton's Crohn's disease was "well controlled" with Remicade and Imuran. (Doc. 6-13, pp. 82-84). Ms. Shelton complained of anxiety and sleep disturbances. (Doc. 6-13, p. 82). Her mood and affect were normal. (Doc. 6-13, p. 83).

On July 2, 2012, Ms. Shelton saw Dr. Gabriel David Lang at the gastroenterology clinic in Chicago for a follow-up appointment. (Doc. 6-12, p. 43). Ms. Shelton reported that she did not have abdominal pain, nausea, vomiting, fever, or chills but did experience an episode of diarrhea and menstrual cramps. (Doc. 6-12, p. 43). Ms. Shelton stated that she was "quite happy with her overall symptomology." (Doc. 6-12, p. 43). Dr. Lang noted that Ms. Shelton's Crohn's disease was in remission, continued her medications, and ordered a colonoscopy in six months. (Doc. 6-12, pp. 45-46). Dr. Lang also noted that Ms. Shelton was a student and lived at home with her mother in Alabama. (Doc. 6-12, p. 44).

On September 24, 2012, Dr. Michael Belmont admitted Ms. Shelton to the Huntsville Hospital with complaints of severe abdominal and pelvic pain and vomiting. (Doc. 6-12, pp. 80, 103). Her history of Crohn's disease was noted. (Doc. 6-12, p. 95). An ultrasound of Ms. Shelton's abdomen and pelvis on September 24 showed a large hemorrhagic ovarian cyst. (Doc. 6-12, pp. 80, 115, 127). A transvaginal ultrasound was performed. (Doc. 6-12, pp. 98, 115). According to the hospital's record of the procedure, Ms. Shelton became very upset about the ultrasound because she had been told that she needed only a transabdominal ultrasound, not a transvaginal ultrasound. (Doc. 6-12, p. 98). The transvaginal ultrasound was very uncomfortable for Ms. Shelton. (Doc. 6-12, p. 98). A pelvic ultrasound a few days later indicated that the mass identified a few

days earlier had decreased in size, and Ms. Shelton's pain "had improved considerably." (Doc. 6-12, pp. 99, 128). At discharge, (Doc. 6-12, p. 80), Ms. Shelton received a prescription for Ambien to help her sleep, (Doc. 6-12, p. 93). At the time of the hospitalization, Ms. Shelton had a prescription for Lexapro for depression. (Doc. 6-12, p. 101).

Ms. Shelton saw Dr. Patel and Dr. John-Paul Voelkel at the Center for Colon & Digestive Disease in Huntsville between November 2012 and September 2014 for routine follow-ups for her Crohn's disease. (Doc. 6-12, p. 139; Doc. 6-13, pp. 65, 73, 77, 139-43). At a November 1, 2012 visit, Ms. Shelton complained of abdominal pain, change in bowel habits, constipation, diarrhea, nausea, weakness, and fatigue. (Doc. 6-13, p. 78). Ms. Shelton had tenderness in the right lower quadrant of her abdomen. (Doc. 6-13, p. 78). Dr. Voelkel noted that Ms. Shelton missed her Remicade infusion on October 19, 2012 and that her pain was worse in the lower right quadrant of her abdomen where she had "significant narrowing" but "never required surgery." (Doc. 6-13, p. 77). Dr. Voelkel prescribed Tramadol for pain and Zofran for nausea. (Doc. 6-13, p. 78). Dr. Voelkel noted that Ms. Shelton reported anxiety and sleep disturbances. (Doc. 6-13, p. 78).

At a November 30, 2012 visit, Dr. Patel noted a history of Crohn's Disease, anxiety, and depression. (Doc. 6-12, p. 139). At the appointment, Ms. Shelton

complained of memory loss. (Doc. 6-12, p. 140). Dr. Patel described Ms. Shelton's Crohn's Disease as stable, and he continued her Remicade therapy. (Doc. 6-12, p. 140).

At an October 16, 2013 visit with Dr. Patel, Ms. Shelton reported that a few days earlier, she had had "severe right lower quadrant abdominal pain" and sought treatment at Crestwood emergency room. (Doc. 6-13, p. 65). Dr. Patel noted that an x-ray taken at the emergency room showed a "moderate amount of stool throughout the colon" with no obstructions and that the emergency room doctor prescribed hydrocodone and recommended steroids "for a possible Crohn's flare." (Doc. 6-13, p. 65). Ms. Shelton's mother reported that she had called Dr. Hanauer and that Dr. Hanauer "felt that this was not a flare of [Ms. Shelton's] Crohn's and asked [Ms. Shelton] to take Miralax and increase her tramadol to 100 mg." (Doc. 6-13, p. 65). At the October 2013 visit, Ms. Shelton complained of abdominal pain, constipation, difficulty swallowing, gas, nausea, pain with bowel movement, vomiting, appetite loss, back pain, joint pain, muscle pain, headaches, confusion, disorientation, anxiety, and fatigue. (Doc. 6-13, p. 66). Her physical exam was normal. (Doc. 6-13, p. 66). Dr. Patel noted that Ms. Shelton's constipation might be exacerbated by her use of clonidine that her psychiatrist prescribed. Dr. Patel asked Ms. Shelton to ask her psychiatrist if the clonidine could be discontinued. (Doc. 6-13, p. 67). Dr. Patel ordered an abdominal and pelvic CT scan. (Doc. 6-

13, p. 67). Ms. Shelton had the CT scan the same day. Ms. Shelton appeared to have an ovarian cyst, but there were no other notable findings. (Doc. 6-13, pp. 69-70).

During a September 26, 2014 visit with Dr. Patel, Ms. Shelton reported that she had a colonoscopy in November 2013 that was "unremarkable." (Doc. 6-13, p. 143). Ms. Shelton also reported depression, anxiety, and memory loss. (Doc. 6-13, p. 144). Ms. Shelton had prescriptions for Lexapro and Klonopin. (Doc. 6-13, p. 143). Ms. Wallace attended the appointment with Ms. Shelton. (Doc. 6-13, p. 143). Dr. Patel noted that Ms. Shelton was "traveling to Germany for a month" and that Dr. Hanauer told Ms. Shelton and her mother that he would "make arrangements to have the Remicade [infusion] done while she [was] in Germany." (Doc. 6-13, p. 143).

*Mental Impairments*

On a school referral, on July 31, 2007, diagnostician Sandra Thomaston with the Alabama Scottish Rite Foundation Learning Centers evaluated Ms. Shelton for dyslexia. (Doc. 6-12, pp. 3-7). Ms. Shelton was a rising eleventh grade student. (Doc. 6-12, p. 3). Ms. Wallace accompanied Ms. Shelton to the appointment and provided Ms. Shelton's background information. Ms. Wallace noted that Ms. Shelton had developmental delays in sitting and standing, and she had some verbal delays. (Doc. 6-12, p. 3).

Ms. Thomaston found that Ms. Shelton had "good receptive language skills" but had "severe deficits in most areas of reading." (Doc. 6-12, p. 6; *see* Doc. 6-12, p. 4). Ms. Shelton's nonverbal reasoning and cognitive skills were below average range. (Doc. 6-12, p. 5). Ms. Thomaston stated that Ms. Shelton's "pattern of strengths and weaknesses [was] typical of students with dyslexia." (Doc. 6-12, p. 6). Ms. Thomaston noted that Ms. Shelton would need academic accommodations, including additional time for tests, fewer spelling words for tests, and oral tests "until [her] reading skills improved." (Doc. 6-12, p. 6).

In June 2011, licensed clinical psychologist Dr. Lois Pope administered the Wechsler Adult Intelligence Scale test to Ms. Shelton. (Doc. 6-13, p. 59). Ms. Shelton sought the evaluation to support a request for an accommodation for the Alabama Exit Exams and the ACT. (Doc. 6-13, p. 59). Ms. Wallace attended the appointment and participated in the diagnostic interview. (Doc. 6-13, p. 59). Ms. Shelton had been homeschooled for 12th grade, in part due to her Crohn's disease and her need to travel to Chicago for treatment. (Doc. 6-13, pp. 59-60).

Dr. Pope noted that Ms. Shelton's "general cognitive ability" was within the borderline range of intellectual functioning based on her full-scale IQ score of 78. (Doc. p. 60). Dr. Pope's diagnostic impressions included a reading disorder, health and academic stresses related to her learning disorder, Crohn's disease, and a GAF score of 60. (Doc. 6-13, p. 61). Dr. Pope recommended that Ms. Shelton

receive unlimited time to take tests and an aid to read test questions aloud "to minimize the impact of her learning deficits on her performance." (Doc. 6-13, p. 62). Dr. Pope attributed Ms. Shelton's reported struggles with attention to anxiety and stress rather than an attention disorder. (Doc. 6-13, p. 62).[10]

On October 2, 2012, a few days after Ms. Shelton was discharged from Huntsville Hospital for the stay related to an ovarian cyst, Ms. Shelton saw psychiatrist Dr. Artie Nelson and reported that she had nightmares about a "horrible experience with a vaginal ultrasound." (Doc. 6-13, p. 6). Ms. Shelton reported that she felt like "no one was there to help her" and she felt "very untrusting" of doctors. (Doc. 6-13, p. 6). Dr. Nelson found that Ms. Shelton was anxious; had average general intellectual functioning; normal thought content and processes; normal attention span; good immediate memory, reliability, judgment, and insight; and no hallucinations or suicidal or homicidal ideations. (Doc. 6-13,

---

[10] In a letter to Ms. Shelton's attorney dated May 22, 2013, licensed professional counselor Bonnie Matlock wrote that she saw Ms. Shelton twice in July 2011. (Doc. 6-12, p. 192). Ms. Shelton attended both appointments by herself, and she was enthusiastic about college. (Doc. 6-12, p. 192). MS. Matlock wrote that in 2011, Ms. Shelton did not seem to "have emotional issues," and she "had no significant symptoms of depression or anxiety, no fears, no conflicts, and no expression of paranoid thought." (Doc. 6-12, p. 192). Ms. Matlock explained that in 2011, she "chose adjustment disorder as [Ms. Shelton's] diagnosis rather than a mood disorder as it applie[d] to situational, transitional reactions." (Doc. 6-12, p. 192). The Court has not found in the administrative record office notes from Ms. Shelton's 2011 visits with Ms. Matlock.

pp. 7-8).  Dr. Nelson wrote that Ms. Shelton was noticeably anxious and "very guarded."  (Doc. 6-13, p. 8).  Dr. Nelson directed Ms. Shelton to return in four weeks.  (Doc. 6-13, p. 7).

Ms. Shelton returned to Dr. Nelson on October 30, 2012 and complained of flashbacks of the transvaginal ultrasound.  She reported better sleep.  (Doc. 6-13, p. 9).  Dr. Nelson observed that Ms. Shelton had average general intellectual functioning, a guarded mood, slow speech, fluctuating attention span, good immediate memory, and excessive worry.  (Doc. 6-13, p. 11).  Dr. Nelson rated Ms. Shelton's "Depression/Mania/Mood lability" and sleep disturbance as moderate.   (Doc. 6-13, p. 10).   Dr. Nelson diagnosed post-traumatic stress disorder.  (Doc. 6-13, pp. 10).  Ms. Shelton rated her symptom progress at 7-8 out of 10, with 10 reflecting extreme symptoms; she rated her overall functioning at 8 out of 10, with 10 reflecting excellent functioning.  (Doc. 6-13, p. 10).  Dr. Nelson noted that Ms. Shelton "was able to engage in treatment with [a] positive outcome."  (Doc. 6-13, p. 10).  Dr. Nelson recommended that Ms. Shelton return in six weeks.  (Doc. 6-13, p. 10).

Six months later, on March 15, 2013, Ms. Shelton returned to Dr. Nelson and reported anxiety and flashbacks.  (Doc. 6-13, p. 12).  Dr. Nelson indicated that Ms. Shelton was experiencing moderate anxiety and depression.  (Doc. 6-13, p. 12).  Ms. Shelton was prescribed clonidine, risperidone, and Ativan.  (Doc. 6-

13, pp. 12-13).[11]  In a "physician's report" that Dr. Nelson completed for purposes of guardianship proceedings, he noted that Ms. Shelton had a history of depression, anxiety, and learning disabilities and that she was "relatively stable" until she was "traumatized by a physical exam" in a "hospital emergency room." (Doc. 6-13, p. 5).  Dr. Nelson noted that "since that event, [Ms. Shelton had] regressed to a child-like state," was "very fearful" and anxious, avoided new stimuli, and had "flashbacks of her hospital incident."  (Doc. 6-13, p. 5).  Dr. Nelson indicated that Ms. Shelton needed a limited guardianship to help her with appointments, finances, and negotiating school and other activities.  (Doc. 6-13, p. 5).

In a report dated April 5, 2013 concerning possible guardianship of Ms. Shelton, Dr. Nelson wrote that Ms. Shelton experienced trauma after a physical exam in a hospital emergency room, had flashbacks of the trauma, and had been in a "child[-]like state" since the incident.  (Doc. 6-13, p 18).  Dr. Nelson noted

---

[11]  Clonidine is used "to treat a variety of psychiatric conditions which include attention deficit hyperactivity disorder [], post-traumatic stress disorder [], and Tourette syndrome."  *See* https://www.ncbi.nlm.nih.gov/books/NBK531717/ (last visited Aug. 16, 2024).

Risperidone is an "atypical antipsychotic medication" used to treat schizophrenia, bipolar, and autism-associated irritability.  *See* https://www.ncbi.nlm.nih.gov/books/NBK459313/  (last visited Aug. 16, 2024).

Lorazepam, whose brand name is Ativan, is used to treat anxiety.  *See* https://my.clevelandclinic.org/health/drugs/20243-lorazepam-tablets (last visited Aug. 16, 2024).

that Ms. Shelton was  "extremely anxious" and had "difficulty talking about her recent past."  (Doc. 6-13, p. 18).  Dr. Nelson reported that Ms. Shelton had symptoms consistent with PTSD.  (Doc. 6-13, p. 18).  Dr. Nelson recommended a guardian to help Ms. Shelton with medical appointments, finances, school, and other activities.  (Doc. 6-13, p. 18).

Ms. Shelton saw Dr. Nelson again on April 12, 2013.  (Doc. 6-13, p. 14). Ms. Shelton was cooperative, and her memory was good, but her mood was incongruent.  (Doc. 6-13, p. 15).  Her attention was fluctuating, and she reported that she was restless.  (Doc. 6-13, p. 15).  Ms. Shelton rated her symptom progress at 7 out of 10, with 10 reflecting extreme symptoms; she rated her overall functioning at 5 out of 10.  (Doc. 6-13, p. 16).  She was anxious about being alone and going to school by herself.  (Doc. 6-13, p. 15).  Dr. Nelson suggested EMDR to address Ms. Shelton's PTSD symptoms.  (Doc. 6-13, p. 16).[12]

In a letter dated two days before her April 12, 2013 appointment with Dr. Nelson, Dr. Nelson wrote to "To Whom It May Concern" that Ms. Shelton had

---

[12]  "EMDR is a structured therapy that encourages the patient to focus briefly on the trauma memory while simultaneously experiencing bilateral stimulation (typically eye movements), which is associated with a reduction in the vividness and emotion associated with the trauma memories. Eye Movement Desensitization and Reprocessing (EMDR) therapy is an extensively researched, effective psychotherapy method proven to help people recover from trauma and PTSD symptoms. Ongoing research supports positive clinical outcomes, showing EMDR therapy as a helpful treatment for disorders such as anxiety, depression, OCD, chronic pain, addictions, and other distressing life experiences (Maxfield, 2019)." See https://www.emdria.org/about-emdr-therapy/ (last visited Aug. 16, 2024).

trouble sleeping, trouble controlling anger, and difficulty concentrating. (Doc. 6-13, p. 4). Dr. Nelson noted that Ms. Shelton was unresponsive at times, had trouble with schoolwork, had flashbacks, had "symptoms of avoidance," and needed help with her daily activities because of her Crohn's disease. (Doc. 6-13, p. 4).

On April 22, 2013, Ms. Shelton returned to see Ms. Matlock for therapy for anxiety. (Doc. 6-12, p. 192). Ms. Wallace accompanied Ms. Shelton to the appointment, and Ms. Shelton asked Ms. Matlock to allow her mother to provide background information because she (Ms. Shelton) was uncomfortable describing the event that triggered her anxiety. (Doc. 6-12, p. 193). Ms. Shelton's mother reported that Ms. Shelton "had been 'sexually assaulted'" in September 2012, "was unable to remain in school," and had returned to live with her parents. (Doc. 6-12, p. 193). Ms. Wallace reported that while she attended college, Ms. Shelton was in the National Honor Society and National Society for Black Engineers, was an Honors mentor, an NAACP undergraduate mentor, and began a service group for breast cancer awareness called "Pink Divas." (Doc. 6-12, p. 193). Ms. Wallace described changes in Ms. Shelton's behavior, including "conversion behaviors, disorientation, nightmares, hallucinations, paranoia[,] and a complete fear of being alone." (Doc. 6-12, p. 193).

After Ms. Wallace provided background information, she left to allow Ms. Matlock to speak with Ms. Shelton alone. (Doc. 6-12, p. 193). Ms. Matlock noted that Ms. Shelton had a distorted gait, rigid posture, and minimal eye contact. (Doc. 6-12, p. 193). Ms. Shelton reported that she was uncomfortable going anywhere alone and needed her mother "to accompany her to class to continue school," had panic attacks and "visions of people coming after her," and slept in her parents' room because she had "nightmares and panic in her own room." (Doc. 6-12, p. 193). Ms. Shelton "expressed embarrassment at her dependence on others." (Doc. 6-12, p. 193). Ms. Matlock provided a diagnosis of "Post Traumatic Stress Disorder, severe with Conversion, Paranoia." (Doc. 6-12, p. 193).[13]

Ms. Shelton's boyfriend brought her to her July 12, 2013 appointment with Dr. Nelson. Her therapy dog accompanied her. (Doc. 6-13, p. 52). Ms. Shelton reported that she had PTSD symptoms "a few times a week" and that she had flashbacks of her "traumatic experience," avoided "situations that evoke[d] memories" of that event, and felt detached or alienated from others. (Doc. 6-13, p. 52). Ms. Shelton had improved affect, improved sense of "foreshortened

---

[13] The Court could not find in the record notes from Ms. Shelton's visits with Ms. Matlock. This information comes from a letter Ms. Matlock, with Ms. Shelton's permission, wrote to a lawyer in Florida. (Doc. 6-12, p. 192).

future," less sleep difficulty, and less frequent irritability and anger outbursts. (Doc. 6-13, p. 52). Dr. Nelson noted that Ms. Shelton appeared calm, friendly, happy, attentive, fully communicative, casually groomed, and shy. (Doc. 6-3, p. 52). Ms. Shelton had a normal mood with "no signs of either depression or mood elevation," no "hallucinations, delusions, bizarre behaviors or other indicators of psychotic process"; intact, logical thoughts; intact cognitive functioning; intact short- and long-term memory; "developmentally appropriate" insight and judgment; and fair social judgment. (Doc. 6-13, p. 52). Dr. Nelson and Ms. Shelton discussed her anxiety and feelings of guilt, coping with panic attacks, and problems in relationships with others. (Doc. 6-13, p. 52). Dr. Nelson continued Ms. Shelton on clonidine and Risperdal. (Doc. 6-13, p. 53).

On September 17, 2013, Dr. Nelson completed a form directed to "Tommy Ragland, the Judge of Probate in Madison County, Alabama" to support Mr. and Mrs. Wallace's petition for guardianship over Ms. Shelton. (Doc. 6-13, p. 17). Dr. Nelson noted that Ms. Shelton had a long history of depression and anxiety and indicated that because of a recent event, Ms. Shelton could not take care of her activities of daily living without assistance. (Doc. 6-13, p. 17).[14]

---

[14] On October 25, 2013, Judge Ragland granted Mr. and Ms. Wallace guardianship over Ms. Shelton and found that Ms. Shelton was "an incompetent person." (Doc. 6-10, p. 19).

At a September 20, 2013 visit with Dr. Nelson, Ms. Shelton reported "significant issues with depression," but she was not in therapy. (Doc. 6-13, p. 51). Ms. Shelton felt sad, had increased social isolation, and continued to struggle at school and at home. (Doc. 6-13, p. 51). Dr. Nelson noted that Ms. Shelton was friendly, looked sad, guarded, attentive, and anxious. (Doc. 6-13, p. 51). Ms. Shelton did not have hallucinations, delusions, or bizarre behaviors; had fair insight and judgment; and exhibited signs of "hyperactive or attentional difficulties," but otherwise had "no gross behavioral abnormalities." (Doc. 6-13, p. 51). Dr. Nelson again suggested EMDR therapy to Ms. Shelton's family. (Doc. 6-13, p. 51).

On October 25, 2013, while Ms. Shelton was at University of Chicago Medical Center for treatment of Crohn's, "psychiatry was consulted due to erratic behavior (hearing voices, functional neurological symptoms, [and] high anxiety)." (Doc. 6-13, p. 27).[15] Dr. Royce Lee examined Ms. Shelton and noted that Ms. Shelton's "PTSD began in 2012 after an alleged sexual assault" regarding an "unordered transvaginal ultrasound [] administered without [Ms. Shelton's] consent." (Doc. 6-13, p. 27). Dr. Lee stated that he did not corroborate the

---

[15] The Court cannot find an October 2023 record concerning Ms. Shelton's treatment at UCMC for Crohn's, but Dr. Lee's record indicates that he was consulted while Ms. Shelton was at the facility, (Doc. 6-13, p. 27), and Ms. Wallace testified at Ms. Shelton's first administrative hearing that Dr. Lee was called in to see Ms. Shelton while Dr. Hanauer was treating Ms. Shelton, (Doc. 6-7, p. 123).

triggering event because exploration of the topic increased Ms. Shelton's anxiety. (Doc. 6-13, p. 27). Ms. Shelton's PTSD symptoms included anxiety, jitteriness, insomnia, flashbacks, nightmares, claustrophobia, and avoiding bathrooms and closed spaces. (Doc. 6-13, p. 27). Dr. Lee also noted that Ms. Shelton reported "hearing voices when triggered with traumatic reminders;" that the voices were "inside her head [] but seem real, and she sometimes answer[ed] them; that she sometimes saw the "female tech" and thought she was real; and that she was in a "dissociative, trance-like state during these occurrences." (Doc. 6-13, p. 27). During Dr. Lee's examination, Ms. Shelton was occasionally dissociative and had an anxious mood, decreased intensity in affect, apparent "dissociative phenomena" in her thought process, and poor insight. (Doc. 6-13, p. 27).

Dr. Lee noted that Ms. Shelton had a history of Crohn's disease and "stress related problems in high school," and she lived with her parents from whom she "received very extensive support. . . to maintain her function." (Doc. 6-13, p. 27). Dr. Lee's diagnosis included "PTSD with prominent dissociative symptoms." (Doc. 6-13, p. 27). Dr. Lee noted that Ms. Shelton's medications managed her agitation and that there were "no current treatments for PTSD that effectively end the syndrome outside of exposure therapy." (Doc. 6-13, p. 28). Dr. Lee recommended residential treatment for exposure therapy and advised that "high

levels of distress and stress" were likely to aggravate Ms. Shelton's underlying medical conditions.  (Doc. 6-13, p. 28).

At a February 14, 2014 visit with Dr. Nelson, Ms. Shelton reported that she "started having some hallucinations" and had "been unable to go to school."  (Doc. 6-13, p. 50).  Ms. Shelton indicated that her PTSD symptoms were worse and more frequent and intense.  (Doc. 6-13, p. 50).  Dr. Nelson noted that Ms. Shelton had moderate depression, a sad demeanor, depressed thought content, psychotic or borderline psychotic process, concrete reasoning, "developmentally appropriate" insight and judgment, "no signs of hyperactive or attentional difficulties," and cooperative and attentive behavior with "no gross behavioral abnormalities."  (Doc. 6-13, p. 50).  Dr. Nelson "continued to suggest EMDR" treatment to Ms. Shelton's family for her PTSD.  (Doc. 6-13, p. 50).

On February 20, 2014, Dr. Lee, who saw Ms. Shelton once in October 2013, completed a medical assessment form for her.  (Doc. 6-13, p. 47).  Dr. Lee indicated that Ms. Shelton had severe limitations in her ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with a supervisor, function independently, and maintain attention and concentration.  (Doc. 6-13, p. 47).  Dr. Lee opined that Ms. Shelton was mildly limited in following simple instructions; moderately limited in following detailed instructions, maintaining personal appearance, and demonstrating reliability; and

severely limited in following complex instructions, behaving in an emotionally stable manner, and relating predictably in social situations. (Doc. 6-13, p. 48).[16]

On February 22, 2014, Dr. Nelson completed a mental assessment form for Ms. Shelton at the request of her attorney. (Doc. 6-13, pp. 55-56). Dr. Nelson marked "N/A" in the "None" column for all occupational adjustments and wrote "patient does not work" under the "Making Performance Adjustments" section. (Doc. 6-13, pp. 56-57). Dr. Nelson reported that Ms. Shelton was mildly limited in maintaining personal appearances and moderately limited in demonstrating reliability and relating predictably in social situations. (Doc. 6-13, p. 57). In a letter to ALJ Stout, Ms. Shelton's attorney noted that Dr. Nelson's mental assessment had been faxed to Ms. Shelton's Social Security folder. Ms. Shelton's attorney wrote that there were inconsistencies in the form and asked for an opportunity to have a re-evaluation done. (Doc. 6-13, p. 55). On March 21, 2014, Dr. Nelson wrote a letter "To Whom It May Concern" requesting that his February 2014 mental assessment form be withdrawn and discarded because he was "unable to answer any questions regarding work abilities for a patient that [did] not work" and directing the reader to Ms. Shelton's patient notes and medication list. (Doc. 6-13, p. 101). On February 25, 2014, Ms. Shelton and Mr. Wallace attended the

---

[16]  The Court cannot tell who requested Dr. Lee's medical assessment for Ms. Shelton.

first administrative hearing with ALJ Stout. (Doc. 6-7, pp. 103-138). ALJ Stout gave Ms. Shelton's attorney time to contact Dr. Nelson about the assessment. (Doc. 6-7, pp. 105-07).

On March 20, 2014, via referral from Ms. Matlock, Ms. Shelton and Ms. Wallace saw licensed clinical social worker Jackie Williams for a consultation about EMDR therapy. (Doc. 6-13, p. 121). Ms. Williams noted that Ms. Shelton had withdrawn from college because of a dispute concerning her companion dog. (Doc. 6-13, p. 121).

At a March 25, 2014 session for Ms. Shelton, Ms. Williams gave Ms. Wallace a pen and tablet and asked her to "write down anything she wanted to say while [Ms. Shelton] answered her own questions without checking with her mother." (Doc. 6-13, p. 119). Ms. Williams noted that Ms. Wallace was "used to speaking for" Ms. Shelton. (Doc. 6-13, p. 119). Ms. Wallace reported that Ms. Shelton was afraid to go to her grandmother's house. (Doc. 6-13, p. 119). Ms. Williams talked to Ms. Shelton about her grandmother and learned that Ms. Shelton's father had abused his mother, Ms. Shelton's grandmother, and Ms. Shelton felt that she did not do enough to stop the abuse. Ms. Shelton stated that she experienced an upset stomach because of the stress associated with her concerns about her grandmother. (Doc. 6-13, p. 119). Ms. Wallace reported that when Ms. Shelton was in the hospital for Crohn's disease, the attendant did not

believe that Ms. Shelton was not sexually active and "forced a transvaginal probe even though [Ms. Shelton] did not consent" and that Ms. Shelton developed a fear of "hospital settings, police, [and] small spaces."  (Doc. 6-13, p. 119).  Ms. Williams described Ms. Shelton's level of functioning as unchanged.  (Doc. 6-13, p. 120).

In a March 25, 2014 letter "To Whom It May Concern," Ms. Matlock reported treating Ms. Shelton using "supportive and cognitive behavioral techniques to work initially on school adjustment and[,] following an assault on campus, on post[-]traumatic stress, separation anxiety, and social phobia."  (Doc. 6-13, p. 103).  Ms. Matlock noted that Ms. Shelton "attempt[ed] to use a service dog" to attend classes, and to "face socially stressful situations."  (Doc. 6-13, p. 103).  Ms. Shelton reported hearing voices saying she could not have her dog and voices "telling her 'they [were] going to take over [her] life.'"  (Doc. 6-13, p. 103).  Ms. Matlock noted that Ms. Shelton left school in February and was hospitalized.  Ms. Matlock stated that Ms. Shelton was seeking more intensive treatment "to prepare for reentry to college."  (Doc. 6-13, p. 103).[17]

In a March 26, 2014 mental medical assessment form, Ms. Matlock indicated that Ms. Shelton was dependent on her parents.  (Doc. 6-13, p. 105).

---

[17]  Ms. Matlock mentioned a session with Ms. Shelton on March 18, 2014, (Doc. 6-13, p. 103).  The Court cannot find in the administrative record notes for Ms. Matlock's sessions with Ms. Shelton.

Ms. Matlock opined that Ms. Shelton was not limited in her ability to maintain her personal appearance; was mildly limited in ability to use judgment, interact with a supervisor, and follow simple instructions; was moderately limited in her ability to relate to co-workers, deal with the public, handle work stresses, and follow complex or detailed instructions; and was severely limited in her ability to function independently without her parents or therapy dog and maintain attention and concentration. (Doc. 6-13, pp. 105-06).

For May 6, 12, and 13, 2014 sessions with Ms. Shelton and Ms. Wallace, Ms. Williams noted the EMDR sessions were "incomplete" and that Ms. Shelton's level of functioning was unchanged. (Doc. 6-13, pp. 115-18). At a June 16 session, Ms. Williams worked with Ms. Shelton on identifying her fears to make them less powerful. (Doc. 6-3, p. 113). Ms. Shelton expressed guilt because she had used her step-father's Fed-Ex card, and she worried that her father would get in trouble, and it would be her fault. (Doc. 6-13, p. 113). Ms. Williams noted that Ms. Wallace dismissed Ms. Shelton's fears. (Doc. 6-13, p. 113). Ms. Williams described Ms. Shelton's functioning as unchanged. (Doc. 6-13, p. 113).

On September 11, 2014, Ms. Williams completed a mental assessment form for Ms. Shelton. (Doc. 6-13, p. 108). Ms. Williams opined that Ms. Shelton was limited in maintaining her personal appearance; was mildly limited in following simple instructions; was moderately limited in her ability to follow work rules,

function independently, follow detailed instructions, and relate predictably in social situations; and was severely limited in her ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, concentrate, follow complex instructions, be reliable, and behave in an emotional stable manner. (Doc. 6-13, pp. 108-09). Ms. Williams reported that Ms. Shelton froze and would leave when she was under stress. She stated that Ms. Shelton needed "many reminders" in therapy. And she indicated that Ms. Shelton could not manage benefits without guidance. (Doc. 6-13, pp. 108-09).

Ms. Matlock completed an assessment form for Ms. Shelton on September 11, 2014. (Doc. 6-13, pp. 129-30). Ms. Matlock opined that Ms. Shelton had no limitation in following simple instructions and maintaining her personal appearance; had mild limitation in interacting with a supervisor for brief sessions; had moderate limitation in using judgment, dealing with work stress, maintaining attention and concentration because of intrusive thoughts, and following complex and detailed instructions; and had severe limitation dealing with the public (because of her need for a service dog), functioning independently, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. (Doc. 6-13, pp. 129-30). Ms. Matlock opined that Ms. Shelton could not manage benefits on her own. (Doc. 6-13, p. 129). Ms. Matlock wrote that Ms. Shelton "continu[ed] to electively rely on parents['] support with

these matters." (Doc. 6-13, p. 129). Ms. Matlock stated that Ms. Shelton was "working to recover from trauma" and "need[ed] medical dr. and desensitizing treatments in addition to psychotherapeutic support." (Doc. 6-13, p. 130).

On September 12, 2014, Ms. Shelton and Ms. Wallace attended the second administrative hearing before ALJ Stout. (Doc. 6-7, pp. 61-102). At the hearing, the most recent assessment form that ALJ Stout had was an assessment from Ms. Williams. ALJ Stout stated that the assessment was dated May 11, 2014, and he described the assessment as appearing in Exhibit 25F, which is a collection of Ms. Williams's notes of her appointments with Ms. Shelton. It seems the ALJ misread the date on the assessment; he seemed to refer to Ms. Williams's September 11, 2014 assessment. (Doc. 6-7, p. 65).

In a September 22, 2014 letter "To Whom It May Concern," Ms. Matlock wrote that she had seen Ms. Shelton before she entered college, and she saw her again in April 2013. By April 2013, Ms. Shelton had been diagnosed with "Post Traumatic Stress following a sexual assault on campus in September 2012." (Doc. 6-13, p. 131).[18] Ms. Matlock saw Ms. Shelton three times in 2013. (Doc. 6-13, p. 131). Ms. Matlock indicated that Ms. Shelton's mental condition had declined in 2014, that Ms. Shelton could not return to college or complete an online course,

---

[18]  Ms. Matlock's mention of a sexual assault on campus seems to be a mistake. The date to which she refers is the date of Ms. Shelton's transvaginal ultrasound.

and that she could not "function independently in any way." (Doc. 6-13, p. 131). Ms. Matlock opined that Ms. Shelton was "profoundly uncomfortable in public," not "emotionally capable of school or work," and needed consistent psychiatric support. (Doc. 6-13, p. 131).

In a September 26, 2014 email to the attorney who was helping Ms. Shelton with her benefits application, Ms. Williams stated that she "spent more than 12 hours with [Ms. Shelton] in very intense treatment" and that when Ms. Shelton "first came to [her], [Ms. Shelton] was unable to go to the Ladies' Room without being accompanied by both her mother and her service dog." (Doc. 6-13, p. 134). Ms. Williams noted that Ms. Shelton needed simple instructions repeated and had "some dissociative symptoms." (Doc. 6-13, p. 134). Ms. Williams opined that Ms. Shelton was "not malingering" and wanted relief from her symptoms. (Doc. 6-13, p. 134). Ms. Williams stated that Ms. Shelton had made minimal progress and could not return to full time work or school. (Doc. 6-13, p. 134).

In an October 3, 2014 email to Ms. Shelton's attorney regarding "Judge Request RE: [Ms.] Shelton," Dr. Lee opined that Ms. Shelton could not attend college or work without her service dog or assistance from her mother; that Ms. Shelton could not function independently because of the severity of her psychiatric symptoms; that Ms. Shelton could not sustain concentration, work with others, manage her time, and be punctual for work; and that Ms. Shelton's

psychiatric symptoms made even "menial employment impossible." (Doc. 6-13, p. 132).

On June 11, 2015, psychiatrist Dr. Amanda Williams with Atlanta Psych Consultants evaluated Ms. Shelton. (Doc. 6-13, pp. 172-75). Dr. Williams noted that Ms. Wallace provided most of Ms. Shelton's history. (Doc. 6-13, p. 175). Dr. Williams wrote that Ms. Shelton had difficulty sleeping, anhedonia, and irritability; that she felt "zombied out" on her medications; that she heard voices that told her what to wear and what color nail polish to use but did not hear the voices as much "being out of Alabama;" that she hated small places and could not stay in a bathroom for long; that she was afraid to walk her service dog alone because she feared "they [would] take her dog" and that the EMDR therapy with Jackie Williams was "very helpful." (Doc. 6-13, p. 174). Dr. Williams noted that Ms. Shelton was "raped" during an "unordered transvaginal" ultrasound administered without her consent; that Ms. Wallace was Ms. Shelton's legal guardian; and that Ms. Shelton's service dog helped her take medications and helped when she dissociated. (Doc. 6-13, p. 174). Dr. Williams noted that Ms. Shelton and her parents had lived in Germany for four months because Germany was more dog friendly. (Doc. 6-13, p. 174). Dr. Williams listed Ms. Shelton's medications as Risperdal, clonidine, dicyclomine, and tramadol and noted Ms.

Shelton's diagnosis of Crohn's disease and her history of dyslexia. (Doc. 6-13, pp. 174-75).

Dr. Williams observed that Ms. Shelton was neatly groomed; appeared stressed and tired; and had fair to poor eye contact, normal speech, full affect, congruent mood, logical associations, normal thought process, automatic judgment, limited insight, good attention and concentration, and intact memory. (Doc. 6-13, p. 175). Dr. Williams wrote that Ms. Wallace might be too fixated on her daughter being a "sick person" and that Ms. Shelton and Ms. Wallace appeared enmeshed. (Doc. 6-13, p. 175). Dr. Williams found it difficult to understand how Ms. Shelton's condition regressed "to the degree that she [had] despite strong advocacy" by Ms. Wallace and ongoing treatment including EMDR. (Doc. 6-13, p. 175). In a note from July 14, 2015, Dr. Williams indicated that she "need[ed] to consider [the] possibility of conversion disorder" and "factitious disorder imposed on another or symptoms being produced for secondary gain," and that wanted to see Ms. Shelton again after Ms. Shelton received neuropsychological testing. (Doc. 6-13, p. 177).

In a July 7, 2015 letter "To Whom It May Concern," Dr. Ashby with the Hope Center of Georgia noted that Ms. Shelton was "under [her] care due to [Ms. Shelton's] disability." (Doc. 6-13, p. 171). Dr. Ashby opined that Ms. Shelton

needed her service dog, handicapped parking, and a live-in caregiver to aid in managing her disability.  (Doc. 6-13, p. 171).[19]

Ms. Shelton attended the third administrative hearing before ALJ Stout on September 17, 2015 and the fourth administrative hearing before ALJ Williams on December 1, 2015.  (Doc. 6-11, pp. 2-58).

On December 14, 2015, licensed psychologists Dr. Miriam Shapiro and Dr. Jason King of Atlanta Comprehensive Neuropsychology conducted a neuropsychological examination of Ms. Shelton to assess her "cognitive and neurobehavioral symptoms."  (Doc. 6-13, pp. 181-82).  Ms. Shelton complained of "auditory and visual hallucinations, vivid nightmares, anxiety, paranoia, and intermittent amnesia where she [did] not recognize family members."  (Doc. 6-13, p. 182).  Ms. Shelton reported that she experienced "command hallucinations, in the form of different voices, multiple times per day;" that the voices told her what to "wear, eat, and say;" and that the voices did not instruct her to harm herself or others.  (Doc. 6-13, p. 182).

Dr. Shapiro and Dr. King observed that Ms. Shelton was fully oriented, appeared suspicious and guarded, spoke in a low volume, had poor eye contact,

---

[19]  ALJ Weaver noted during an August 17, 2016 hearing that there were "no medical or mental health treatment records" for Dr. Ashby and left the "record open for five days" after the hearing for Ms. Shelton's attorney to submit those records.  (Doc. 6-6, p. 100).  The Court could not locate Dr. Ashby's treatment records in the administrative record.

displayed an odd affect with a child-like demeanor, and self-reported a "confused" mood. (Doc. 6-13, p. 183). During the testing, Ms. Shelton "frequently muttered to herself during the testing" and "stated that she was responding to voices." (Doc. 6-13, p. 183). Dr. Shapiro and Dr. King found that Ms. Shelton had mild limitation in "generative-word (both letter and category) fluency, mental processing speed, and "attentional vigilance"; Ms. Shelton had moderate impairment in "memory for verbal information," "visuospatial and constructional abilities," and inhibition. (Doc. 6-13, p. 184). Ms. Shelton had a full-scale IQ of 75, which placed Ms. Shelton in the "borderline range;" Dr. Shapiro and Dr. King noted an IQ score of 75 was a "decline from [Ms. Shelton's prior] estimated cognitive baseline." (Doc. 6-13, p. 184). Ms. Shelton's diagnoses included "Schizoaffective Disorder, depressive type" and generalized anxiety disorder. (Doc. 6-13, p. 184). Dr. Shapiro and Dr. King noted that Ms. Shelton might have "difficulty making medical, legal, or financial decisions." (Doc. 6-13, pp. 185).

On March 16, 2016, Ms. Shelton saw psychiatrist Dr. Darlene McNulty in Atlanta. (Doc. 6-13, p. 188).[20] Ms. Shelton's father and service dog accompanied her to the visit. (Doc. 6-13, p. 188). At the March 16 visit, Ms. Shelton reported

---

[20] Dr. McNulty noted that she had seen Ms. Shelton in September 2015; the Court cannot locate a record of that visit in the administrative record. (Doc. 6-13, p. 188). Notes from the March 16 visit indicate that Dr. McNulty gave Ms. Shelton a prescription for Risperdal on September 21, 2015. (Doc. 6-13, p. 188).

that she "went to stay with [her] father in Germany" in December 2015 and "did well off of the Risperdal while in Germany," but her therapist, whom Ms. Shelton reported she had seen the day before, recommended she resume Risperdal. (Doc. 6-13, p. 188).[21] Ms. Shelton reported seeing a therapist weekly. (Doc. 6-13, p. 190).

Ms. Shelton complained of auditory and visual hallucinations, paranoia, anxiety, and poor sleep. She reported living with her parents and attending school as a senior at GSU in marketing. (Doc. 6-13, p. 190). Ms. Shelton indicated that she had "not been able to attend school" for several weeks because her medications made her tired, and she had difficulty focusing in class. Ms. Shelton commented that she "usually ha[d] to drop classes" because they "[got] to be too much." (Doc. 6-13, p. 190). Dr. McNulty noted that Ms. Shelton's mental status exam, appearance, speech, thought process, and cognition were normal and that her mood and thought content was abnormal given reported hallucinations. (Doc. 6-13, p. 191). Dr. McNulty gave Ms. Shelton a GAF score of 55 and gave her a 30-day prescription of Risperdal. (Doc. 6-13, p. 192).[22]

---

[21] The Court has not found a record of a mental health visit in March 2016 that precedes the March 16 visit with Dr. McNulty.

[22] Dr. McNulty included "55" under Axis V regarding diagnoses. (Doc. 6-13, p. 192). Axis V assesses "overall [mental] functioning known as the GAF." *See* https://www.ncbi.nlm.nih.gov/books/NBK519711/ (last visited Aug. 21, 2024). A GAF score of 55 reflects "moderate symptoms . . . or moderate difficulty in social occupational, or social

At an April 12, 2016 visit with Dr. McNulty, Ms. Shelton reported that despite Risperdal, she continued to hear voices that told her to "get angry." (Doc. 6-13, p. 193). Dr. McNulty noted that Ms. Shelton had used clonidine previously "with good effect" and that Ms. Shelton "wonder[ed] if she should restart" it. (Doc. 6-13, p. 194). Ms. Wallace spoke with Dr. McNulty and told her that Ms. Shelton was "decompensating." (Doc. 6-13, p. 193). Ms. Wallace reported that Ms. Shelton's last psychiatrist and her therapist wanted to "get rid of the dog," that Ms. Shelton's auditory hallucinations were "command in nature," and that Ms. Shelton's voices told her to "choke other people," but Ms. Shelton had "no plan to harm anyone." (Doc. 6-13, p. 193). Dr. McNulty increased Ms. Shelton's Risperdal prescription and prescribed clonidine. (Doc. 6-13, p. 197).

In an April 15, 2016 letter "To Whom It May Concern," Dr. Ashby stated that she had treated Ms. Shelton since June 2015, and Ms. Shelton suffered from schizophrenia with active auditory and visual hallucinations, anxiety, and depression. (Doc. 6-13, p. 186). Dr. Ashby wrote that Ms. Shelton should not have to "endure any more hearings or assessments" because they could "exacerbate [Ms. Shelton's] symptoms and cause her considerable psychological harm." (Doc. 6-13, p. 186).

---

functioning." *See* https://www.webmd.com/mental-health/gaf-scale-facts (last visited Aug. 21, 2024).

Though there are no records of a visit with the licensed social worker since September 2014, on April 25, 2016, Ms. Williams completed a medical assessment for Ms. Shelton. (Doc. 6-13, p. 199). Ms. Williams opined that Ms. Shelton had moderate limitation in her ability to relate to co-workers, interact with a supervisor, follow simple instructions, and maintain personal appearance; Ms. Shelton had severe limitations in her ability to deal with the public, use judgement, deal with work stresses, function independently, maintain attention and concentration, follow complex instructions, behave in an emotionally stable manner, and demonstrate reliability. (Doc. 6-13, pp. 199-200). Ms. Williams's narrative remarks are similar to the remarks she provided in her September 2014 assessment. (Doc. 6-13, pp. 108-09, 199-200).

In an April 26, 2016 letter addressed "To Whom It May Concern," Dr. Ashby wrote that "it [was] [a]bsurd to think that Ms. Wallace [was] in any way coercing [Ms. Shelton] to exaggerate her symptoms." (Doc. 6-13, p. 201). Dr. Ashby indicated that she treated Ms. Shelton alone in the office while Ms. Wallace sat in the waiting room and that Ms. Shelton suffered from schizophrenia with active auditory and visual hallucinations. (Doc. 6-13, p. 201). Dr. Ashby wrote that "[i]n [her] 20 years of clinical experience, [Ms. Shelton's] presentation is NOT made up and that her mental stability [was] fragile at best." (Doc. 6-13, p. 201) (emphasis in original).

On April 29, 2016, Dr. Ashby completed a mental residual functional capacity assessment for Ms. Shelton. (Doc. 6-13, pp. 209-11). Dr. Ashby noted that she had treated Ms. Shelton since June 2015. (Doc. 6-13, p. 211). Dr. Ashby stated that Ms. Shelton was distrustful of new people, could not be in environments that had a lot of people, and would need flexibility because her hallucinations increased with stress. (Doc. 6-13, p. 211). Dr. Ashby opined that Ms. Shelton was moderately limited in her ability to remember locations and work-like procedures; understand, remember, and carry out simple instructions; perform within a schedule, maintain regular attendance, and be punctual; make simple work-related decisions; socially interact; and be aware of normal hazards and take necessary precautions. (Doc. 6-13, pp. 209-10). Dr. Ashby opined that Ms. Shelton had marked limitation in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in proximity to others without distraction; complete a normal workweek without interruptions because of her psychological symptoms; respond appropriately to changes in the work setting; travel to unfamiliar places; and set realist goals or make plans independently of others. (Doc. 6-13, pp. 209-10).

### *Dr. Henry Randall Griffith's Administrative Mental Assessment*

On February 23, 2016, the Disability Determination Service notified Ms. Shelton that it had scheduled a consultative "special medical examination" for her with psychologist Dr. Henry Randall Griffith on March 9, 2016. DDS mailed a reminder on February 29, 2016. (Doc. 6-11, pp. 84-85). Ms. Shelton did not appear for the appointment. (Doc. 6-11, p. 85). Ms. Wallace and Ms. Shelton's attorney stated that "they did not wish for the exam to be rescheduled." (Doc. 6-11, p. 85).

On April 8, 2016, the Disability Determination Service notified Ms. Shelton of a new consultative appointment with Dr. Griffith on April 26, 2016. (Doc. 6-11, p. 89). Jodie Bohannon with the SSA ODAR Hearing Office in Florence, Alabama noted that Ms. Wallace called on April 11, 2016 and stated that she wanted to cancel the appointment with Dr. Griffith because she did not have transportation to the appointment and because she "felt it was not a good idea for her daughter to meet someone new and discuss things." (Doc. 6-11, p. 90). Ms. Bohannon told Ms. Wallace to address the issue with Ms. Shelton's attorney and noted that the "ALJ heard part of this conversation at [Ms. Bohannon's] desk." (Doc. 6-11, p. 90). Ms. Bohannon informed Ms. Wallace that she needed to send a written request concerning the appointment. (Doc. 6-11, p. 90).

The same day, Ms. Tena Fleming with the Alabama DDS district office noted that Ms. Wallace called to explain that she and Ms. Shelton did not have transportation to Birmingham for the appointment with Dr. Griffith. (Doc. 6-11, p. 91). Ms. Wallace "wanted to know why her daughter [had] to travel to [Birmingham] for the exam when they [had] submitted a neuropsychological exam." (Doc. 6-11, p. 91). Ms. Fleming told Ms. Wallace that she needed to talk to Ms. Shelton's attorney. (Doc. 6-11, p. 91). Ms. Fleming asked to speak to Ms. Shelton; Ms. Wallace stated that Ms. Shelton "was not available" and that Ms. Wallace "handle[d] everything for her." (Doc. 6-11, p. 91). Ms. Wallace asked Ms. Fleming if Ms. Shelton could get an earlier appointment with Dr. Griffith, and Ms. Fleming indicated the scheduling department would check. (Doc. 6-11, p. 91).

Ms. Fleming noted that Ms. Wallace called again on April 11, 2024 and stated that Ms. Wallace "spoke with Dr. Griffith's office" and requested that the appointment be rescheduled for the next week, but Dr. Griffith's appointments were "booked into May." (Doc. 6-11, p. 96). Ms. Wallace stated that "she took it upon herself to contact several [n]europsychologists in the Huntsville area" and that Dr. Christine Lloyd did "exam[s] for Social Security" and could examine Ms. Shelton that week. (Doc. 6-11, p. 96). Ms. Wallace also indicated that Dr. Branson was a neuropsychologist in Huntsville. (Doc. 6-11, p. 96). Ms. Fleming

informed Ms. Wallace that neither doctor was on the "CE Panel." (Doc. 6-11, p. 96). Ms. Fleming noted that Ms. Wallace "again stated she did not understand why her daughter [had] to be evaluated by a [n]europsychologist and wanted to know the battery of testing that would be administered" because she wanted to "prepare her daughter about the tests because of her mental state. . . ." (Doc. 6-11, p. 96). Ms. Fleming explained that the ALJ ordered the testing and that the "battery of testing was at the doctor's discretion as it related to [Ms. Shelton's] particular case." (Doc. 6-11, p. 96).

Ms. Bohannon noted that Ms. Wallace called again on April 15, 2016 and indicated that she had made an appointment with a different doctor for April 16 and wanted the ALJ to approve the appointment. (Doc. 6-11, p. 95). Ms. Bohannon told Ms. Wallace that such requests needed to be submitted in writing to the ALJ and that Ms. Wallace would be "financially responsible" for the medical appointment. (Doc. 6-11, p. 95). Ms. Wallace "put Dr. Ashley on the phone to make a statement about the claimant," and Ms. Bohannon "stopped [Dr. Ashley] and informed her that this was not proper procedure." (Doc. 6-11, p. 95).

On April 25, 2016, Ms. Shelton's attorney sent a letter to the Social Security Administration Florence ODAR Office stating that Ms. Shelton would not attend the appointment with Dr. Griffith on April 26, 2016 because Ms. Shelton's treating physicians felt that "seeing another evaluator" would cause

"psychological damage" to Ms. Shelton.  (Doc. 6-11, p. 98).  Ms. Shelton's attorney attached letters from Ms. Williams and Dr. Ashby to his April 25, 2016 letter.  (Doc. 6-11, pp. 98-100).

On April 26, 2016, Ms. Shelton attended the consultation appointment with Dr. Griffith.  She arrived 15 minutes late with "her mother, her service dog, her caregiver, and two small children."  (Doc. 6-13, p. 207).  Dr. Griffith noted that ALJ Weaver asked that Dr. Griffith evaluate Ms. Shelton "without Ms. Shelton's mother present."  (Doc. 6-13, p. 207).  Dr. Griffith told Ms. Wallace that he would not allow input from her "as part of the evaluation."  (Doc. 6-13, p. 207).  "Ms. Shelton did not agree to the terms of the evaluation," "refused to undergo [the] evaluation," and left Dr. Griffith's office.  (Doc. 6-13, pp. 203-04, 206-07).

Dr. Griffith prepared a report of his brief meeting with Ms. Shelton.  He included a summary of Ms. Shelton's medical records in his report.  (Doc. 6-13, pp. 206-07).  Dr. Griffith observed that Ms. Shelton appeared casually dressed and "reasonably groomed," spoke without difficulty, and had a calm mood and affect. (Doc. 6-13, p. 207).

On May 2, 2016, Cheryl Maye with the DDS received a call from Ms. Wallace.  (Doc. 6-11, p. 101).  Ms. Wallace stated that Ms. Shelton "did not respond favorably to Dr. Griffith because of issues that happened in the past," that

Dr. Griffith was "less than kind" to Ms. Shelton, and that a "person in Dr. Griffith's office" witnessed Dr. Griffith's demeanor.  (Doc. 6-11, p. 101).

### Ms. Shelton's First Administrative Hearing

Ms. Shelton and Ms. Wallace attended an administrative hearing with ALJ Stout on February 25, 2014, approximately five months after Ms. Shelton's visit to the University of Chicago emergency room for mental health treatment and weeks after Ms. Shelton reported to Dr. Nelson that she had begun hallucinating and could not attend school.  (Doc. 6-13, p. 50).

Ms. Wallace testified that Ms. Shelton was 22 years old and graduated from high school in 2009.  (Doc. 6-7, pp. 112-13).  Ms. Wallace testified that Ms. Shelton worked part-time as a nanny while she was in high school but did not work after high school.  (Doc. 6-7, pp. 117-19).  Ms. Wallace stated that Ms. Shelton enrolled at Faulkner Christian University in the fall of 2009 with disability accommodations and transferred to the University of Alabama at Huntsville – UAH – under a disability program in the spring of 2012.  (Doc. 6-7, pp. 115-16).  Ms. Wallace testified that she had to attend classes with Ms. Shelton or hire someone to attend classes with Ms. Shelton when she was not available.  (Doc. 6-7, p. 127).  Ms. Wallace testified that Ms. Shelton had to go to a dorm room between classes to rest but that Ms. Shelton had "not spent a night in the dorm since 2012."  (Doc. 6-7, p. 128).  Ms. Wallace testified that two weeks before the

hearing, on Dr. Nelson's recommendation, Ms. Shelton withdrew from on-campus classes at UAH because of her anxiety. (Doc. 6-7, pp. 128-29). Ms. Shelton was trying to participate in classwork online, but UAH's provost had approved Ms. Shelton's withdrawal from her spring classes. (Doc. 6-7, p. 129).[23] Ms. Wallace explained that Dr. Nelson is a child psychologist, and he did not feel that there was anything more he could do for Ms. Shelton. (Doc. 6-7, pp. 122-23).

Regarding Ms. Shelton's Crohn's disease, Ms. Wallace testified that when Ms. Shelton was admitted to Huntsville Hospital for more than one week, a "GI specialist" could not "stop [Ms. Shelton's] pain or bleeding," and the doctor wanted to remove Ms. Shelton's colon and put her on a colostomy bag. (Doc. 6-7, p. 113). Ms. Wallace stated that Ms. Shelton saw a specialist in Chicago for a

---

[23] Dr. Nelson's notes regarding his February 14, 2014 visit with Ms. Shelton indicate that she told him that she was not attending school. The notes do not indicate that Dr. Nelson advised Ms. Shelton that she should not attend school. (Doc. 6-13, p. 50).

The ALJ stated that he would need records from the schools Ms. Shelton attended to confirm Ms. Wallace's testimony. A record from Faulkner indicates that Ms. Shelton took one class there in the fall 2009 semester, one class in the spring 2010 semester, one class in the fall 2010 semester, and two classes in the fall 2011 semester. (Doc. 6-24, p. 22). Ms. Shelton's UAH transcripts indicate that she was enrolled there and completed classes from the Spring of 2012 to the Fall of 2013. (Doc. 6-24, pp. 18-25). The UAH transcripts indicate that Ms. Shelton received transfer credit for three classes that she took at Columbia College, two during the fall 2011 semester and one during the summer of 2013 and for classes that she took at Faulkner in 2010 and 2011. Ms. Shelton's UAH transcripts indicate that she withdrew from the classes for which she registered in the spring of 2014. (Doc. 6-24, p. 20). Ms. Shelton received credit from Columbia College in Columbia, Missouri for 16 classes. (Doc. 6-24, p. 25). She made Dean's List in three marketing classes and withdrew from a human resources management class. (Doc. 6-24, p. 24). The Columbia College record does not indicate the dates on which Ms. Shelton took those 16 classes.

second opinion, that the doctor considered the colostomy to be "excessive and unnecessary," and that the doctor treated Ms. Shelton with Remicade and steroids. (Doc. 6-7 pp. 113-14).

Ms. Wallace testified that on September 25, 2012, Ms. Shelton was at the Huntsville Hospital for treatment for Crohn's disease, and a technician performed a transvaginal probe against Ms. Shelton's will when the "technician forcibly pried [Ms. Shelton's] legs open and forced the transvaginal probe inside of her." (Doc. 6-7, pp. 120-21). Ms. Wallace stated that the doctor "had to sedate [Ms. Shelton] twice to keep her calmed down." (Doc. 6-7, p. 122). Ms. Wallace testified that this incident resulted in Ms. Shelton developing "post traumatic stress disorder, a rape victim syndrome[,] and conversion disorder." (Doc. 6-7, p. 122). Ms. Wallace testified Ms. Shelton started taking Risperdal, Lorazepam, and Klonopin and that the medications made Ms. Shelton unable to function normally about 10 hours each day, slowed her ability to process and think, and "zombie[d] her out." (Doc. 6-7, pp. 123-24). Ms. Wallace testified that even if Ms. Shelton were able to get a job, she would be unable to work every day because she could not drive and could not stay awake long because of her medications. (Doc. 6-7, pp. 126-27).

Ms. Wallace testified that Ms. Shelton slept in the room with her because Ms. Shelton had "extremely detailed nightmares." (Doc. 6-7, pp. 124-25). Ms.

Wallace stated that Ms. Shelton had "full blown conversations" with someone Ms. Shelton insisted was in the room, and Ms. Shelton could not understand why Ms. Wallace could not see the person.  (Doc. 6-7, p. 125).  Ms. Wallace testified that Ms. Shelton tried to enroll in McLean Psychiatric Care at Harvard and at the Menninger Clinic in Houston, but she was not successful because "her needs were too severe for their inpatient program[s]."  (Doc. 6-7, p. 126).

Ms. Shelton testified that her Crohn's disease caused her to go to the bathroom on short notice.  (Doc. 6-4, p. 130).  She stated that on September 25, 2012, the situation surrounding the transvaginal probe "create[d] severe problems."  (Doc. 6-7, p. 131).  Ms. Shelton testified that Risperdal caused drowsiness and that she was not attending school because the medication made it "hard to focus."  (Doc. 6-7, p. 132).  Ms. Shelton stated that she obtained a "specially trained disability dog" to help her but did not know where she got the dog.  (Doc. 6-7, p. 131).

Regarding hallucinations, Ms. Shelton testified that she heard voices every day.  (Doc. 6-7, p. 132).  Ms. Shelton stated that Ms. Wallace said the voices were not real, but Ms. Shelton thought they were real.  (Doc. 6-7, p. 132).  Ms. Shelton indicated that she did not think she was getting better because her symptoms got "worse and worse every day," and she heard voices more frequently.  (Doc. 6-7, p. 134).

Ms. Shelton testified that she did not drive and that her only activity outside of school was attending church with her mother. (Doc. 6-7, pp. 133-34). Ms. Shelton testified that she did not talk on the phone, prepare her food, or go shopping. (Doc. 6-7, p. 135).

### Ms. Shelton's Second Administrative Hearing

On September 12, 2014, Ms. Shelton and Ms. Wallace attended a hearing for ALJ Stout to obtain testimony from vocational expert Barbara Azzam and psychiatrist and medical expert Dr. Miriam Sherman. (Doc. 6-7, pp. 61-102). Ms. Azzam attended the hearing in person, and Dr. Sherman attended via telephone. (Doc. 6-7, p. 63).

Dr. Sherman stated that she had studied Ms. Shelton's medical record several weeks before the hearing and had reviewed it again before the hearing. (Doc. 6-7, p. 72). Because it was not in the record that Dr. Sherman reviewed, ALJ Stout explained Jackie Williams's May 11, 2014 mental assessment. (Doc. 6-7, pp. 65-66). Ms. Shelton's attorney clarified that Jackie Williams was not a social worker but a "counselor with the Alabama Psychiatric Services Center" and that Dr. Lois Pope and Bonnie Matlock worked in the same group with Ms. Williams. (Doc. 6-7, pp. 65-66).

Dr. Sherman noted that Ms. Shelton had a "tenth grade IQ of 78" and that her "reading disorder" did not meet or equal listing 12.02 or 12.05. (Doc. 6-7, p.

69).  Dr. Sherman opined that Ms. Shelton's PTSD did not meet or equal listing 12.08 because she was appropriately treated with therapy and was on Ativan and Risperdal.  (Doc. 6-7, pp. 70, 79-80).

Dr. Sherman opined that Ms. Shelton had mild restriction in her activities of daily living, moderate limitation in maintaining social functioning, moderate limitation in maintaining concentration, and no episodes of decompensation. (Doc. 6-7, p. 70).  Dr. Sherman testified that Ms. Shelton could "do simple, repetitive tasks, nonpublic since she [was] distressed when she [was] with large groups of people." (Doc. 6-7, p. 70).  Dr. Sherman acknowledged that her opinion was different from other assessments in the record but explained that because Ms. Shelton was only moderately limited in interacting with people, Ms. Shelton could have a "relatively, quiet, non-stress job that would involve repetitive tasks" in which she could not work with the public but "could deal with supervisors." (Doc. 6-7, p. 71).

Dr. Sherman testified that she agreed with Dr. Lee's opinion that Ms. Shelton could do "simple, repetitive tasks[,] non-public."  (Doc. 67, pp. 75-76). Dr. Sherman did not agree with Dr. Lee's opinion that Ms. Shelton had severe limitations in "oral abilities" and stated that "within the right conditions and given some support from supervisors, [Ms. Shelton] would be able to deal with work stresses."  (Doc. 6-7, pp. 76-77).  Dr. Sherman testified that if the task was simple

and repetitive, Ms. Shelton would not be severely impaired in following work rules and that Ms. Shelton could deal with some co-workers because "obviously she [had] friends." (Doc. 6-7, p. 77).

Dr. Sherman testified that her assessment was not different from Ms. Matlock's assessment that Ms. Shelton was moderately limited in relating to coworkers, working with the public, and dealing with work stressors. (Doc. 6-7, pp. 82). Dr. Sherman noted that Ms. Matlock was not a doctor and that Dr. Sherman did not agree with her assessment that Ms. Shelton had "significant problems with attention and concentration" because the record contained "no evidence elsewhere" regarding a severe limitation in this area and no "diagnosis of ADHD." (Doc. 6-7, p. 83). Dr. Sherman also noted the variability in assessments in the record of Ms. Shelton's limitations in maintaining her personal appearance from no limitation to moderate limitation. (Doc. 6-7, p. 86-87).

Ms. Wallace testified that she dressed Ms. Shelton and picked out her clothes because Ms. Shelton could not dress herself after the "rape" in 2012. (Doc. 6-7, pp. 88-89). Ms. Wallace testified that she spent "every single hour" with Ms. Shelton "at the recommendation of [the] doctor, the psychiatrist Dr. Nelson." (Doc. 6-7, pp. 92-93). Ms. Wallace testified that Dr. Lee recommended a "three-to-four-month in-patient psychiatric stay" for Ms. Shelton and that he "was trying to get [Ms. Shelton] committed to some of the hospitals." (Doc. 6-7, p. 94). Ms.

Wallace stated there was no lawsuit pending "as of yet" regarding the transvaginal probe incident, but she filed a "sexual assault charge with the police department" that the hospital president "fought." (Doc. 6-7, p. 97). Ms. Wallace testified that the "doctor pulled [Ms. Shelton] out of school" in February 2014, that the voices told Ms. Shelton "they were going to get her," and that Ms. Shelton could not "concentrate enough" to complete on-line classes. (Doc. 6-7, pp. 97-98).

The ALJ asked VE Azzam to assume an individual with no work history, the same age and education as Ms. Shelton, who had no physical impairments and could "perform unskilled work, no contact with the public and would successfully interact with supervisors and coworkers." (Doc. 6-7, pp. 98-99). Ms. Azzam testified that the individual could perform some jobs at the light level of exertion such as laundry worker with 4,000 available jobs in Alabama and 400,000 available jobs nationally; housekeeper with approximately 10,000 available jobs in Alabama and 500,000 available jobs nationally; and photocopy operator with approximately 600 available jobs in Alabama and 60,000 available jobs nationally. (Doc. 6-7, p. 383).

The ALJ then asked Ms. Azzam to add to the hypothetical the limitation that the individual had "problems which interfered with their concentration, persistence [,] and pace to the extent the individual would be unable to sustain even unskilled work periods of up to two consecutive hours." (Doc. 6-7, p. 99).

Ms. Azzam testified that with the added limitation, the jobs of laundry worker, housekeeper, and photocopy operator would not be available for the individual. (Doc. 6-7, p. 100). The ALJ then asked Ms. Azzam to add to the hypothetical the limitations that the individual would not be able to sustain interactions with supervisors, coworkers, and the public without being accompanied by someone; could not act in a socially appropriate manner; could not sustain a regular workday from 32 to 40 hours; and would have "frequent absences from work." (Doc. 6-7, p. 384). Ms. Azzam testified that those limitations would preclude all work activity. (Doc. 6-7, p. 100).

### Ms. Shelton's Third Administrative Hearing

On September 17, 2015, ALJ Stout held a supplemental telephone hearing to reexamine Dr. Sherman. (Doc. 6-11, p. 58). Ms. Shelton, her attorney, and a vocational expert attended the hearing, but Ms. Wallace did not attend. (Doc. 6-7, pp. 53, 55). As discussed, at Ms. Wallace's request, ALJ Stout recused from the case. (Doc. 6-7, p. 58). Vocational expert John McKinney testified that Ms. Shelton had no past relevant work. (Doc. 6-7, pp. 58-59).

### Ms. Shelton's Fourth Administrative Hearing

On December 1, 2015, Ms. Shelton and her attorney attended a hearing before ALJ Williams; Ms. Wallace was not present for the hearing. (Doc. 6-7, pp. 2-51). Ms. Shelton stated that she lived with her mother in Madison, Alabama.

(Doc. 6-7, p. 301). Ms. Shelton testified that her mother helped her take a shower and get dressed for the hearing. (Doc. 6-7, p. 18).

Regarding her mental impairments, Ms. Shelton testified that she had experienced hallucinations for about five years. (Doc. 6-7, pp. 19-20). Ms. Shelton testified that she heard voices that told her "what socks to wear [and] what to do" and took "over her mind." (Doc. 6-7, p. 14). Ms. Shelton stated that she heard voices the morning of the hearing and had to call her counselor Jackie Williams. (Doc. 6-7, pp. 19, 31-32). Ms. Shelton indicated that she took Risperdal for her hallucinations "maybe four or five years," but she was "not sure of the date" because she had a "really bad memory." (Doc. 6-7, p. 14). Ms. Shelton stated that she also took Klonopin for her psychiatric condition. (Doc. 6-7, p. 14). She stated that the traumatic events involving the transvaginal ultrasound made it difficult for her "to recognize things" and caused difficulty in her judgment and decision making and that she had difficulty understanding instructions from others. (Doc. 6-7, pp. 15-16).

Ms. Shelton testified that her Crohn's disease usually caused her to have an upset stomach or nausea and sometimes caused diarrhea; she stated she had diarrhea the morning of the hearing. (Doc. 6-7, p. 18). Ms. Shelton stated that her Crohn's disease caused sharp pain in her stomach and that she received

Remicade infusions and took Zofran and tramadol for her Crohn's disease. (Doc. 6-7, pp. 14-15, 19).

She testified that her service dog was trained to bring her medications to her, to keep people out of her personal space, and to calm her down when she had an anxiety attack; she did not go anywhere without her dog. (Doc. 6-7, pp. 19, 34). Ms. Shelton stated that she went everywhere with her mother because Ms. Shelton did not like to stay by herself. (Doc. 6-7, p. 21). Ms. Shelton testified that the only time she was away from her mother was when her mother received cancer treatments, and then a paid caregiver stayed with Ms. Shelton. (Doc. 6-7, pp. 22-23). Ms. Shelton stated that the only time she walked was when she wanted to go outside with her dog. (Doc. 6-7, p. 21). Ms. Shelton stated that she could not walk "very far" because of her Crohn's disease and problems with her knees. (Doc. 6-7, p. 22). She testified that some days she took one long nap and other days she took three short naps because she had trouble sleeping at night. (Doc. 6-7, p. 22).

Ms. Shelton testified that she was afraid of crowds and did not attend organizational meetings like church. (Doc. 6-7, p. 25). Ms.` Shelton testified that she was enrolled in a marketing class in college but had to leave school because she had a hard time focusing after the 2012 hospital incident. (Doc. 6-7, pp. 27-28). Ms. Shelton stated that she spent a month in Germany in 2014 for a vacation

with her mother and stepfather and had a scheduled infusion for her Crohn's disease while she was there. (Doc. 6-7, pp. 32-33, 41). She testified that her stepfather went to Germany as part of his job, and she went "because [she] had never been to Germany." (Doc. 6-7, p. 41).

Ms. Shelton testified that she did not date because it was too much for her to handle, but she had "people that [she] talked to." (Doc. 6-7, p. 36). Ms. Shelton stated that she did not have friends and stayed to herself. (Doc. 6-7, p. 39). Ms. Shelton testified that she liked to watch cartoons and play with her dog. (Doc. 6-7, pp. 17-18).

Ms. Shelton testified that she could not work because of her fear of crowds, fear of being away from her mother and dog, and her Crohn's' disease. (Doc. 6-7, p. 40). Ms. Shelton testified that she could not work an eight-hour job with normal breaks and a sit and stand option because it was "hard for [her] to function for long periods of time on one thing." (Doc. 6-7, p. 25).

John McKinney testified as a vocational expert. (Doc. 6-7, p. 44). The ALJ asked Mr. McKinney to assume a hypothetical individual with the same age, education, and work experience as Ms. Shelton who was limited to light work with the following limitations:

> the hypothetical individual ha[d] no exertional limitations. She [could] perform simple routine tasks requiring no more than short simple instructions and simple work[-]related decision making with few workplace changes. She [could] have

occasional interactions with coworkers and supervisors and
the general public.

(Doc. 6-7, p. 44). Mr. McKinney testified that the individual could perform light, unskilled work as an inspector with 115,000 available jobs nationally; a hand packager with 150,000 available jobs nationally; and a garment folder with 100,000 available jobs nationally. (Doc. 6-7, pp. 44-45).

In the ALJ's second hypothetical, she asked Mr. McKinney to add to the first hypothetical that the individual could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; could stand/or walk for six to eight hours in an eight-hour workday; occasionally could climb ramps and stairs but never climb ladders, ropes, or scaffolds; frequently could balance, stoop, kneel, crouch, and crawl; should avoid extreme heat and cold and workplace hazards; could perform simple routine tasks requiring no more than simple instructions and simple work-related decisions; and could have occasional interactions with coworkers and supervisors and no interactions with the general public. (Doc. 6-7, p. 45). Mr. McKinney concluded that an individual with those limitations could perform the same jobs listed with the first hypothetical. (Doc. 6-7, p. 46).

The ALJ asked Mr. McKinney to assume a third hypothetical that added to the previous hypotheticals that the individual could not maintain concentration, persistence, or pace to complete an eight-hour workday or a 40-hour work week.

(Doc. 6-7, p. 46). Mr. McKinney testified that an individual with those limitations could not maintain competitive employment. (Doc. 6-7, p. 46).

The ALJ asked Mr. McKinney to assume a fourth hypothetical that included an accommodation that allowed the individual to have a service dog accompany her to work. (Doc. 6-7, p. 330). Mr. McKinney testified that employers would reasonably accommodate a service dog. (Doc. 6-7, p. 330).

### *Birmingham Cooperative Disability Investigations Unit Investigation*

After ALJ Williams recused herself, ALJ Weaver was assigned to Ms. Shelton's case. (Doc. 6-6, p. 156). On March 25, 2016, ALJ Weaver referred Ms. Shelton's disability claim to the Birmingham Cooperative Disability Investigations Unit. (Doc. 6-24, p. 5). The CDIU issued a summary report of its findings on July 20, 2016 and a supplemental report on August 29, 2016. (Doc. 6-24, pp. 6-17, 35-38). Valaine Maxey, the "OIG Point of Contact," conducted the investigation and wrote the report; program specialist Cheryl Jones, the "DDS Point of Contact," assisted in the investigation. (Doc. 6-24, pp. 9, 17).

The ALJ found that the investigation uncovered evidence that Ms. Shelton had intentionally misrepresented her mental symptoms and limitations to her treating physicians. (Doc. 6-6, p. 65). CDIU's investigation revealed that Ms. Shelton had Facebook profiles under different names. (Doc. 6-24, p. 9). Facebook posts during the relevant time period indicated that Ms. Shelton had attended

formal events; had been in crowds; had a boyfriend; took a vacation in Hawaii and attended a ski weekend with a group; attended a taping of Family Feud; organized and attended events for the PinkDivas service organization that she founded; and enrolled in and completed college classes from fall 2011 through fall 2013. (Doc. 6-24, pp. 9-16). The details of the CDIU's investigation are attached as Appendix 1 to this opinion.

In the supplemental report, Ms. Jones sated that Ms. Shelton posted a photograph on July 23, 2016 of herself at what appeared to be in a restaurant wearing a "sash that said 'Graduate'; Ms. Shelton's post stated: "'Thank you soooo much to everyone that supported me today . . . It mean[t] so much to me that you all came #classof2016.'" (Doc. 6-24, p. 38). Ms. Jones also reported that she personally observed Ms. Wallace, Ms. Shelton's service dog, and an unknown male child shopping at the Summit mall on August 20, 2016. (Doc. 6-24, p. 38). Ms. Jones indicated that Ms. Wallace was near a vehicle registered to Ms. Wallace's husband "giving the service dog some water." Ms. Jones reported that Ms. Wallace left the child and dog at the vehicle and walked into Lucky Brand Jeans for a few minutes and then came back to the vehicle; that Ms. Wallace, the child, and dog went into the Apple Store; that during the ten minutes she observed them, Ms. Jones "did not see" Ms. Shelton. (Doc. 6-24, p. 38).

### Ms. Shelton's Fifth Administrative Hearing

On August 17, 2016, Ms. Wallace and Ms. Shelton's attorney attended a hearing before ALJ Weaver; Ms. Shelton was not present. (Doc. 6-6, p. 96). Ms. Wallace stated that Ms. Shelton had lived with she and her husband since October of 2012. (Doc. 6-6, p. 139). Ms. Wallace stated that she had breast cancer, had had multiple surgeries in Atlanta, and had stayed three months to recover from the surgeries. (Doc. 6-6, p. 143).

Ms. Wallace testified that Ms. Shelton was not capable of living independently. (Doc. 6-6, pp. 139, 140). Ms. Wallace indicated that she went to Germany and left Ms. Shelton with a "caregiver or family member" and had to return from Germany when Ms. Shelton's doctor called and said Ms. Shelton's schizophrenia was "extremely severe." (Doc. 6-6, p. 140). Ms. Wallace testified that Ms. Shelton told "her doctor the voices [were] telling her to kill herself or telling her to harm other people." (Doc. 6-6, p. 152). Ms. Wallace testified that Ms. Shelton had "severe cognitive" limitations in her ability to "understand[] what people ask her." (Doc. 6-6, p. 146). Ms. Wallace stated that Dr. Nelson and Dr. Ashby prescribed a therapy dog for Ms. Shelton and that Dr. McNulty agreed that a service dog would be beneficial for Ms. Shelton's PTSD and Crohn's disease. (Doc. 6-6, pp. 144-45).

Ms. Wallace testified that when she and Ms. Shelton saw Dr. Griffith for the consultative examination, Dr. Griffith told Ms. Shelton in a "very stern and

frightening voice" to come with him, and Ms. Shelton asked if her mother could come with her. (Doc. 6-6, p. 102). Ms. Wallace stated that Dr. Griffith said "absolutely not" and that Ms. Shelton "began to get noticeably upset" and had an anxiety attack to which the service dog started to react. (Doc. 6-6, pp. 102-03). Ms. Wallace testified that she told Dr. Griffith that Ms. Shelton was "afraid to [go] back there because she did not know [Dr. Griffith] and the way he had approached her was frightening to her as someone that had been sexually assaulted and it was in a setting [] where she should have been protected with doctors and medical staff." (Doc. 6-6, p. 103). Ms. Wallace testified that Dr. Griffith said he would "just tell them you refused to come." (Doc. 6-6, p. 103). Ms. Wallace stated that another patient sitting in the waiting area "wrote a letter that [ALJ Weaver] should have in regards to [Dr. Griffith's] behavior towards [them]." (Doc. 6-6, p. 102).[24] Ms. Wallace testified that she asked to speak with Dr. Griffith, but he would not speak with her because ALJ Weaver ordered him to "have no conversation with" Ms. Wallace. (Doc. 6-6, p. 103). Ms. Wallace stated that Dr. Griffith said that he had not read Ms. Shelton's file and would do so after he saw Ms. Shelton. (Doc. 6-6, p. 103).

Ms. Wallace testified that she was not at Huntsville Hospital with Ms. Shelton when the transvaginal ultrasound incident occurred; Ms. Wallace's

---

[24] The Court could not find in the record the letter to which Ms. Wallace referred.

mother was with Ms. Shelton and called Ms. Wallace from the hospital.  (Doc. 6-6, p. 104).  Ms. Wallace stated that they did not pursue legal action against the hospital because her attorney advised against it.  (Doc. 6-6, p. 105).

ALJ Weaver asked about Ms. Shelton's passport, and Ms. Wallace indicated she did not know where the passport was.  (Doc. 6-6, p. 105).  Ms. Shelton's attorney stated that he saw no relevance in the passport, that he did not "know that [they] were going to be prosecuted in th[e] hearing," that the "whole tone" of the hearing reflected that the hearing was "not a nonbiased hearing in anyway," that the "hostility was overwhelming," and that he wanted the record to reflect his concerns.  (Doc. 6-6, pp. 105-06).  Ms. Wallace testified that she did not know the last time that Ms. Shelton visited Germany, that Ms. Wallace did not come prepared to answer that question at the hearing, and that ALJ Weaver was "trying to do a fraud investigation."  (Doc. 6-6, p. 107).  Ms. Wallace testified that Ms. Shelton accompanied her to Germany on "occasions."  (Doc. 6-6, p. 108).

Ms. Wallace stated that she was not aware of Ms. Shelton's Facebook accounts under different names.  (Doc. 6-6, p. 138).  Ms. Wallace testified that the fact that Ms. Shelton smiled in pictures and laughed and joked did not represent how Ms. Shelton normally behaved.  (Doc. 6-6, p. 135).  Ms. Wallace stated that she tried to make Ms. Shelton happy because Ms. Shelton did not "have much to look forward to as a 25-year-old woman that on occasion still [slept] in the bed

with [] her mother and [was] afraid to go outside. . . ."  (Doc. 6-6, p. 109).  Ms. Wallace testified that the "society of schizophrenia . . .  would take great offense" to the Social Security Administration insinuating that because a person had joy in her life, smiled, or left the house, a person was not disabled.  (Doc. 6-6, pp. 149-50).

Ms. Wallace testified that she made sure Ms. Shelton's clothes matched, she was bathed, her hair was done, and she brushed her teeth.  (Doc. 6-6, pp. 135, 137).  At Ms. Shelton's doctor's request, Ms. Wallace took Ms. Shelton out to do things to distract her and make her happy.  (Doc. 6-6, p. 136).  Ms. Wallace explained that some of the pictures submitted into the record from the investigation involved St. Jude's Hospital functions that Ms. Shelton attended with Ms. Wallace.  (Doc. 6-6, p. 109).  Ms. Wallace said that she had lost a son to leukemia when he was seven years old and that St. Jude's events were "very dear to [her] family."  (Doc. 6-6, p. 109).

Ms. Wallace stated that Ms. Shelton was not a contestant on Family Feud; Ms. Shelton received tickets to the show because of her disabilities, and Steve Harvey allowed her on stage to take photos.  (Doc. 6-6, p. 136-37).  Ms. Wallace testified that though Ms. Shelton smiled and hugged Mr. Harvey in the picture, that was not Ms. Shelton's "normal appearance;" Ms. Shelton "fe[lt] comfortable with [Mr. Harvey] because she [felt] like she [knew] him" and "her brain [kept]

relating back to her and her grandmother watching him." (Doc. 6-6, p. 137).  Ms. Wallace provided a CD of pictures of Ms. Shelton "in normal living," and Ms. Shelton's attorney offered to admit the CD as an exhibit.  (Doc. 6-6, pp. 135, 147); the ALJ indicated she would look at the CD when she returned to her office.  (Doc. 6-6, p. 148).[25]

Ms. Wallace stated that after the traumatic events in 2012, Ms. Shelton withdrew from "from various courses," that Ms. Shelton's grades deteriorated in the spring and summer of 2013, and that Ms. Shelton withdrew from "the program" at "the doctor's recommendation." (Doc. 6-6, pp. 112-13). Ms. Wallace testified that Ms. Shelton took on-line courses at Columbia College and that it took Ms. Shelton seven years to graduate. (Doc. 6-6, p. 112). Ms. Wallace stated that she hired tutors for Ms. Shelton and "assisted [Ms. Shelton] in completing her work." (Doc. 6-6, p. 139). Ms. Wallace testified that she and her husband "paid over $600,000 for what [had been] a three -year course of action for school and

---

[25]  In an August 23, 2016 letter to Ms. Shelton's attorney, ALJ Weaver indicated that she checked with "IT staff" who "instructed the CD [was] not in a format that [was] allowed by the Social Security Administration" and that the CD was being returned to the attorney. (Doc. 6-9, p. 176). In her October 4, 2016 opinion, the ALJ noted that the "CD was not admitted in the proper format that would allow it to be viewed on SSA's computers, and the CD was returned to the representative." (Doc. 6-6, p. 71; Doc. 6-9, p. 176). In an August 29, 2016 letter to ALJ Weaver, Ms. Shelton's attorney wrote that he offered to play the CD at the hearing so ALJ Weaver could watch the video and that he did not know how to submit the video to the ALJ "other than a CD." (Doc. 6-11, p. 123). Ms. Shelton's attorney asked ALJ Weave to advise regarding how he could "get [the video] into the Social Security record/evidence." (Doc. 6-11, p. 123).

thousands of dollars in tutors and in special disability aids" for Ms. Shelton to graduate college. (Doc. 6-6, p. 151). Ms. Wallace stated that Ms. Shelton "was scheduled to transfer to Harvard," that Ms. Shelton "had qualified" for Harvard, that her grades were good enough to get into Harvard, and that the life that Ms. Shelton was living was not the life Ms. Wallace had planned for her daughter. (Doc. 6-6, p. 152).

Regarding Ms. Shelton's Crohn's disease, Ms. Wallace testified that Ms. Shelton still received regular infusions and that Dr. Hanauer, Dr. Wolf, and Dr. Patel treated Ms. Shelton for Crohn's disease. (Doc. 6-6, pp. 140-41).

Ms. Wallace stated that the doctors believed that Ms. Shelton had severe mental impairments and that a Madison County judge found Ms. Shelton mentally incompetent at the age of 20. (Doc. 6-6, p. 146). Ms. Wallace stated: "So, we fooled all those people into thinking [Ms. Shelton's] got mental problems. We fooled the judge. We fooled those experts." (Doc. 6-6, p. 146).

Clinical psychologist Dr. Sydney Garner testified as a medical expert. (Doc. 6-6, pp. 113-14).[26] Dr. Garner testified she had reviewed Ms. Shelton's medical records and had sufficient evidence to form a medical opinion about Ms.

---

[26] ALJ Weaver began the hearing with Ms. Wallace's testimony. (Doc. 6-6, p. 101). Because Dr. Garner had "another hearing coming up," ALJ Weaver interrupted Ms. Wallace's testimony and had Dr. Garner testify. (Doc. 6-6, p. 113). Ms. Wallace then completed her testimony. (Doc. 6-6, p. 135). Ms. Shelton's attorney did not object. (Doc. 6-6, p. 113).

Shelton's impairments. (Doc. 6-6, p. 115). Dr. Garner described Ms. Shelton's recorded mental impairments as post-traumatic stress disorder and schizoaffective disorder. (Doc. 6-6, p. 115). Dr. Garner noted that Ms. Shelton received treatment and medication for both impairments and that neither treatment was effective. (Doc. 6-6, p. 116).

Dr. Garner opined that Ms. Shelton did not meet a listing under 12.06 for PTSD or 12.03 for schizoaffective disorder because Ms. Shelton had no "marked impairments in social functioning, academic or occupational functioning." (Doc. 6-6, p. 116). Dr. Garner testified that the "record [had a] substantial amount of information which [was] inconsistent with [Ms. Shelton's] reports of functioning" and that Ms. Shelton was "functioning at a much higher level" than "any scores reflect[ed]." (Doc. 6-6, p. 116). Dr. Garner testified that Ms. Shelton's academic achievement and the "totality of the record" reflected that Ms. Shelton did not have marked impairments maintaining concentration, persistence, or pace. (Doc. 6-6, p. 116). Dr. Garner opined that Ms. Shelton had no limitation understanding, carrying out, or remembering instructions and no limitation using judgment or dealing with routine changes in the workplace. (Doc. 6-6, p. 117). Dr. Garner testified that Ms. Shelton had mild limitation in responding appropriately to supervisors, coworkers, and work pressure in the workplace. (Doc. 6-6, p. 117).

Dr. Garner testified that Ms. Shelton's mild limitations would not limit her vocationally. (Doc. 6-6, p. 117).

The ALJ asked Dr. Garner to explain why the medical opinions in the administrative record were inconsistent with her findings. (Doc. 6-6, pp. 117-18). Dr. Garner testified Ms. Shelton and Ms. Wallace told medical providers that Ms. Shelton had "severe anxiety and severe fears and phobias being around people and crowds." (Doc. 6-6, p. 117). Dr. Garner explained:

> That [was] certainly not consistent with the significant documentation of the claimant tolerating people and crowds. [Ms. Shelton] ha[d] reported that she ha[d] daily psychosis, auditor[y], and visual hallucinations. Her ability to volunteer, presently complete school with passing grades[,] and social media presence did not show any behavior that would be consistent with any kind of daily psychosis.

(Doc. 6-6, pp. 118). The ALJ asked Dr. Garner if someone could "objectively determine whether someone else [was] having hallucinations." (Doc. 6-6, p. 188). Dr. Garner testified that she looked for "signs and symptoms" associated with hallucinations. (Doc. 6-6, p. 118).

> One of those [was] cognitive decline, cognitive deterioration, and [Ms. Shelton] ha[d] been capable of cognitively remaining focused enough to complete her schooling and graduate. [Dr. Garner] also look[ed] for deterioration in [Ms. Shelton's] personal hygiene, which [was] very consistent with psychosis, especially from one whose psychosis is occurring daily. [Dr. Garner did not] see any evidence of that. [Dr. Garner] would also look for significant social withdrawal and all of the updated information that [Dr. Garner] ha[d] received d[id] not document that. . . . [P]sychotic behavior ha[d] a

very distinct layer that [was] usually seen and noticed certain times
in all domains of one's life.

(Doc. 6-6, pp. 118-19).  Dr. Garner noted Dr. McNulty's medical records that

contained March 16, 2016 and April 12, 2016 PHQ-9 self-report questionnaires

in which Ms. Shelton "den[ied] having any problems in those areas assessed."

(Doc. 6-6, p. 119).  Dr. Garner noted that Dr. Amanda Williams's suspected that

Ms. Shelton was enmeshed with Ms. Wallace.  (Doc. 6-6, p. 124).  Dr. Garner

explained that enmeshment clinically is different from dependency; enmeshment

could "mean emotionally enmeshed where one [was] not thinking for themselves

because another person [was] thinking for them or making decisions for them

when indeed they actually [were] capable of doing  it themselves."  (Doc. 6-6, p.

124).  Dr. Garner stated that she could not find medical treatment records from

Ms. Shelton's visits with Dr. Ashby in the file.  (Doc. 6-6, p. 126).

Ms. Shelton's attorney asked Dr. Garner if her opinion would be different

if Ms. Shelton's academic test scores "were not as a result of her mental capacity"

because there was "somebody else that was doing the [academic] work for [Ms.

Shelton] even though [Ms. Shelton] got the grade." (Doc. 6-6, p. 131).  Dr. Garner

testified that her opinion would not change because Ms. Shelton's "social

functioning abilities" were inconsistent with schizophrenia or PTSD.  (Doc. 6-6,

p. 132).  ALJ Weaver cautioned Ms. Shelton's attorney that he was "getting into

the area of fraud in school" if someone did the work and took the tests for Ms. Shelton. (Doc. 6-6, p. 132).

Dr. Garner testified that her opinion about Ms. Shelton's functional capacity was different from other doctors' opinions because Dr. Garner was the "only one who [had] seen all [Ms. Shelton's] daily functioning abilities" in the totality of the record. (Doc. 6-6, p. 132). Dr. Garner noted that Ms. Shelton indicated to doctors that she could "no longer complete school" and could not "do school," but evidence in the record was contrary to Ms. Shelton's assertions. (Doc. 6-6, p. 133). Dr. Garner opined that Ms. Shelton's "daily functioning" reflected in the social media evidence in the record was "not consistent with [Ms. Shelton's] labeled diagnosis" of schizophrenia. (Doc. 6-6, p. 133).

Ms. Barbara Azzam testified as a vocational expert. (Doc. 6-6, p. 155). The ALJ asked Ms. Azzam to consider the work available to an individual the same age, education, and work experience as Ms. Shelton, with no exertional limitations and the following non-exertional limitations: could understand, remember, and carryout simple instructions and tasks; could have infrequent and well-explained workplace changes; and could concentrate and remain on task for two hours at a time sufficient to complete an eight-hour workday. (Doc. 6-6, p. 155). Ms. Azzam testified that the individual could work at medium exertion, unskilled jobs as a hand packager, with 500,000 available jobs nationally; a

janitor, with 500,000 available jobs nationally; and a dishwasher, with 300,000 available jobs nationally. (Doc. 6-6, pp. 155-56).

In her second hypothetical, the ALJ asked Ms. Azzam to assume the limitations in the first hypothetical except the individual would be limited to a light range of work and non-intensive interaction with coworkers and the public. (Doc. 6-6, p. 156). Ms. Azzam testified that the individual could work as a housekeeper, with 500,000 available jobs nationally; a photocopy operator, with 60,000 available jobs nationally; and a packager with 400,000 available jobs nationally. (Doc. 6-6, p. 156).

In a third hypothetical, the ALJ asked Ms. Azzam to assume the limitations in the second hypothetical, but the individual would be limited to simple, routine, repetitive tasks not performed in a fast-paced production environment. (Doc. 6-6, pp. 156-57). Ms. Azzam testified the individual could work as a housekeeper and photocopy operator, with the same number of available jobs as noted for the second hypothetical, and a laundry worker, with 400,000 available jobs in the national economy. (Doc. 6-6, p. 157).

The ALJ asked Ms. Azzam in a fourth hypothetical to assume the same limitations as the third hypothetical except the individual could not follow simple, routine, repetitive instructions. (Doc. 6-6, p. 157). Ms. Azzam testified those limitations would preclude all work. (Doc. 6-6, p. 157).

## THE ALJ'S DECISION

The ALJ found that Ms. Shelton had not engaged in substantial gainful activity since her alleged onset date of December 1, 2009. (Doc. 6-6, p. 38). The ALJ determined that Ms. Shelton suffered from the severe impairments of post-traumatic stress disorder, dyslexia, Crohn's disease (in remission), and iron deficiency anemia. (Doc. 6-6, p. 38). Based on a review of the medical evidence, the ALJ concluded that Ms. Shelton did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-6, pp. 38-39).

Considering Ms. Shelton's impairments, the ALJ evaluated Ms. Shelton's residual functional capacity. (Doc. 6-6, p. 160). The ALJ determined that Ms. Shelton had the RFC to perform:

> light work . . . [and] understand, remember, and carry out simple instructions and tasks. She [was] limited to jobs involving infrequent and well[-]explained work place changes and casual, non-intensive interactions with co-workers and the public. She [was] able to concentrate and remain on task for 2 hours at a time, sufficient to complete an 8[-]hour workday.

(Doc. 6-6, p. 39).

Based on this RFC and relying on testimony from a vocational expert, the ALJ concluded that jobs existed in significant numbers in the national economy that Ms. Shelton could perform, including housekeeper, photocopy operator, and

packager.  (Doc. 6-6, p. 79).  The ALJ determined that Ms. Shelton was not disabled as defined by the Social Security Act.  (Doc. 6-6, p. 201).

## THE APPEALS COUNCIL DECISION

The Appeals Council reviewed the ALJ's decision.  (Doc. 6-6, pp. 131, 134).  The Appeals Council agreed with the ALJ's findings under steps one, two, three, four, and five of the sequential process.  (Doc. 6-6, p.11).  The Appeals Council did not agree that the ALJ "provided an adequate symptom evaluation in accordance with Social Security Regulation 16-3p." (Doc. 6-6, p. 11).[27]  Applying SSR 16-3p, the Appeals Council concluded that Ms. Shelton's "statements concerning the intensity, persistence, and limiting impacts of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Doc. 6-6, pp. 11-12).

Applying the revised listings for mental impairments, the Appeals Council concluded that Ms. Shelton had severe impairments that did "not meet or equal in severity an impairment in the Listing of Impairments."  (Doc. 6-6, p. 11, 12). Considering Ms. Shelton's impairments, the Appeals Council determined that Ms. Shelton had "no limitations in the ability to understand, remember, and apply information; moderate limitations in the ability to interact with others; mild

---

[27] The ALJ evaluated Ms. Shelton's symptoms under SSR 96-4p.  (Doc. 6-6, p. 39).

limitations in the ability to concentrate, persist, or maintain pace; and mild limitations in the ability to adapt and manage [herself]." (Doc. 6-6, p. 12).

The Appeals Council adopted the ALJ's finding that Ms. Shelton did not have past relevant work history. (Doc. 6-6, p. 12). The Appeals Council adopted the ALJ's finding that other jobs existed in significant numbers in the national economy that Ms. Shelton could perform, including a housekeeper, a photocopy machine operator, and packager. (Doc. 6-6, pp. 12-13). The Appeals Council determined that Ms. Shelton was not disabled before August 18, 2013, the date Ms. Shelton attained age 22, through the date of the ALJ's decision. (Doc. 6-6, p. 134).

## STANDARD OF REVIEW

The scope of review in this matter is limited. The Appeals Council decision is "reviewable as the final decision of the Commissioner of Social Security." *Solomon v. Comm'r, Soc. Sec. Admin.*, 532 Fed. Appx. 837, 839 (11th Cir. 2013) (quoting *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998)). The Appeals Council's decision is "entitled to the same deference as the decision of the ALJ." *Parker v. Bowen*, 788 F.2d 1512, 1522 (11th Cir. 1986).

A district court must determine whether substantial evidence in the record supports the Appeal Council's factual findings. *Parker*, 788 F.2d at 1517. "Substantial evidence is more than a scintilla and is such relevant evidence as a

reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the Appeals Council. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the Appeal Council's decision is supported by substantial evidence, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r of Soc. Sec.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the Appeal Council's legal conclusions, a district court must determine whether the Appeals Council applied the correct legal standards. If the court finds an error in the Appeal Council's application of the law, or if the court finds that the Appeals Council failed to provide sufficient reasoning to demonstrate that it conducted a proper legal analysis, then the district court must reverse the Appeals Council's decision. *See Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *The ALJ's Assessment of Ms. Shelton's Treating Physicians' Opinions*

Ms. Shelton contends that the ALJ and Appeals Council did not assign the proper weight to the opinions of her treating physicians. (Doc. 10, p. 75). Because

the Appeals Council adopted the ALJ's findings regarding the weight the ALJ afforded the opinions of Ms. Shelton's treating physicians, (Doc. 6-6, pp. 10-12), the Court must determine whether substantial evidence supports the ALJ's assessment of Ms. Shelton's treating physicians' opinions.

Because Ms. Shelton filed her disability claims before March 27, 2017, the Court must apply the treating-physical rule to determine whether the ALJ applied the proper weight to the opinions of Ms. Shelton's treating physicians.[28] "Absent 'good cause' to the contrary, [an ALJ] must give substantial weight to the opinion, diagnosis, and medical evidence of a treatment physician." *Walker v. Comm'r of Soc. Sec.*, 987 F.3d 1333, 1338 (11th Cir. 2021) (citing *Crawford*, 363 F.3d at 1159. An ALJ must clearly articulate the reasons for declining to give a treating physician's opinion considerable weight. *Winschel,* 631 F.3d at 1179. Good cause exists "when the treating physician's opinion is not supported by evidence, evidence supports a contrary finding, or the treating physician's opinion is

---

[28] For claims filed on or after March 27, 2017, an ALJ must "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Under the new regulations, the ALJ must assess the "supportability of the medical opinion, its consistency with other record evidence, the physician's relationship with the claimant, the physician's specialty, and other relevant information, such as the physician's familiarity with the other record evidence and with making a claim for disability." 20 C.R.F. § 404.1520c(a).

conclusory or inconsistent with the physician's own records." *Walker*, 987 F.3d at 1338 (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).

The ALJ thoroughly recounted Ms. Shelton's medical history, the medical opinions in the record, the CDIU's investigation findings, and the testimony from the administrative hearings. (Doc. 6-6, pp. 40-71). The ALJ noted that Ms. Shelton's case was "complicated" and acknowledged that Dr. Nelson, Dr. Lee, Dr. Ashby, Dr. King, Dr. Shapiro, Ms. Matlock, and Ms. Williams determined that Ms. Shelton had "severe and disabling mental limitations as a result of alleged assault/trauma at the hospital emergency room when a transvaginal ultrasound was performed." (Doc. 6-6, pp. 65, 71). The ALJ stated that she "would ordinarily be persuaded by the reports of multiple treating sources" and find Ms. Shelton disabled within the meaning of the Social Security Act. (Doc. 6-6, p. 65). The ALJ noted that Ms. Shelton's and Ms. Wallace's "unusual behavior" at the "consultative examination by Dr. Griffith and the statements of Dr. Ashby that [Ms. Shelton] should not have to 'endure' another assessment and/or hearing prompted the personnel at Alabama Disability Determination Services and the [ALJ] to request an investigation" by the CDIU. (Doc. 6-6, p. 65).

The ALJ found that "the evidence discovered by the CDIU investigation show[ed] that the claimant and her mother [had] clearly misrepresented and exaggerated [Ms. Shelton's] symptoms and limitations." (Doc. 6-6, p. 71). The

ALJ stated that, "in view of the social media evidence" that showed that Ms. Shelton engaged in "a much wider range of social activities than reported to her treating sources," the ALJ could not "find that the opinions of any of [Ms. Shelton's] treating sources [were] entitled to substantial weight." (Doc. 6-6, p. 77). Instead, the ALJ gave Dr. Garner's expert medical opinion "great weight because [Dr. Garner] had the opportunity to review all the evidence, including the social media evidence obtained by the CDIU." (Doc. 6-6, p. 77). The ALJ articulated her reasons for declining to give considerable weight to the treating physicians' opinions, and substantial evidence supports the weight she afforded those decisions.

The ALJ noted that Ms. Shelton and Ms. Wallace told Ms. Shelton's treating mental health professionals that Ms. Shelton was not able to go anywhere without her mother or her service dog. (Doc. 6-6, p. 77). The ALJ pointed to numerous Facebook photographs from the investigation that did "not show [Ms. Shelton's] mother or her dog with her" and to the CDIU investigator's statement that she saw Ms. Shelton's mother and the service dog at a shopping center in August 2016, and Ms. Shelton was not present. (Doc. 6-6, p. 77). The ALJ noted that though Ms. Shelton testified at the December 2015 hearing that she was afraid of crowds with more than five people, several Facebook photos showed Ms. Shelton "in large crowds of people." (Doc. 6-6, p. 77). The ALJ noted that Ms.

Shelton testified that she did not date, but Terrance Burroughs's Facebook page indicated he was in a relationship with Ms. Shelton, and he posted pictures in February 2015, April 2015, December 2015, and February 2016 of he and Ms. Shelton embracing.  (Doc. 6-6, p. 77).

The ALJ found that Ms. Shelton's documented IQ scores of 75 and 78 from Dr. Pope, Dr. Shapiro, and Dr. King were inconsistent with evidence in the record that showed that Ms. Shelton had a higher level of intellectual functioning.  (Doc. 6-6, p. 75).  The ALJ noted that Ms. Shelton's college transcripts showed she completed college courses in multiple semesters and graduated from college despite her reports to Dr. Shapiro and Dr. King that she dropped out of school and "made several unsuccessful attempts to return."  (Doc. 6-6, pp. 74-75).  The ALJ noted that Ms. Shelton's college transcripts showed that she had a 3.2 GPA from the fall of 2009 until the fall of 2011; completed an honors lecture course, several business courses, and a cardio-kickboxing course in spring 2013; completed multiple classes in summer 2013; took an honors English seminar and three other courses in fall 2013, attended classes at UAH from fall 2012 to spring 2014; had a 4.0 GPA and completed 2 honors courses in fall 2014; and withdrew from multiple classes in the Spring of 2014.  (Doc. 6-6, pp. 67-68, 75; Doc. 6-24, pp. 19-25).  Substantial evidence in the records supports the ALJ's findings regarding Ms. Shelton's intellectual functioning.

Regarding Dr. Ashby's opinions, the ALJ noted that the fact that Dr. Ashby would "not allow her records to be submitted" to the ALJ and that Ms. Shelton and Ms. Wallace "would not sign updated authorization forms" to secure Dr. Ashby's treatment records "reflect[ed] poorly on the overall credibility" of Ms. Shelton, Ms. Wallace, and Dr. Ashby. (Doc. 6-6, pp. 76-77). The ALJ stated that if Ms. Shelton "was as severely impaired as alleged by Dr. Ashby, her treatment records should support that" allegation. (Doc. 6-6, p. 77). The ALJ found that Dr. Ashby's diagnosis of schizophrenia was "not entitled to significant weight in view of [Dr. Ashby's] refusal to release her treatment record," Ms. Shelton's "successful completion of college," and the "social media evidence of a wide variety of activities." (Doc. 6-6, p. 77). Because the record contained "no actual treatment records" from Dr. Ashby, the ALJ gave no weight to Dr. Ashby's opinion. (Doc. 6-6, p. 77). The lack of Dr. Ashby's treatment records and Dr. Ashby's refusal to submit treatment records to support her opinions constituted substantial evidence for the ALJ to discount Dr. Ashby's opinions regarding Ms. Shelton's mental limitations.

The ALJ noted Dr. Garner's testimony that physicians diagnosed patients "based upon a patient's presentation at the time of the evaluation and the reports of a person's functioning." (Doc. 6-6, p. 72). The ALJ pointed out that the "mental health personnel who have treated [Ms. Shelton] did not have the social

media evidence available to the them when they rendered their opinions." (Doc. 6-6, p. 72). The ALJ stated that the "investigation by the CDIU show[ed] Facebook and social media evidence which clearly show[ed] that [Ms. Shelton] function[ed] much better than opined by the treating sources." (Doc. 6-6, p. 72). The ALJ described in detail the CDIU's investigation results and specific social media posts that the ALJ found contradicted what Ms. Shelton and Ms. Wallace reported to the treating physicians and noted that the treating physicians did not consider the social media evidence when they formed their opinions.[29] Substantial

---

[29] To illustrate the inconsistencies between Ms. Shelton's and Ms. Wallace's reports to the treating doctors about Ms. Shelton's mental functioning and her actual mental functioning, the ALJ wrote:

> For example, the assessment completed by Dr. Nelson in April 2013 . . . stated that [Ms. Shelton] had regressed to a child-like state after the September 2012 incident; that she [was] fearful, anxious and avoid[ed] new situations; and that she needed a limited guardian. (Exhibit 14F)[.] Ms. Matlock stated in her letter of May 22, 2013 that [Ms. Shelton] was seen in April 2013 due to extreme and persistent anxiety[,] and her mother reported that she was having hallucinations, paranoia, disorientation, and a complete fear of being alone. (Exhibit 13F)[.] However, the Facebook page for Ms. Diva Wallace-Shelton show[ed] a picture of [Ms. Shelton] smiling and taking a selfie picture wearing an elephant hat on December 16, 2012. (Exhibit 54F)[.] A Facebook posting from Ve Spencer's page, dated April 30, 2013 show[ed] [Ms. Shelton] at the 2013 Urban Ski Weekend in Pigeon Forge Tennessee. She [was] shown smiling in a group picture of 9 people, including her mother. (Exhibit 68F)[.] . . . A posting to the Facebook page of Cassidy Summerhill state[d] that the UAH PinkDivas [would] be holding a Model and Talent Casting Call on July 11, 2013. A posting on the same Facebook page, dated July 10, 2013, state[d] that the claimant made an "A" on her marketing test. The claimant stated in a posting dated July 29, 2013 that she "just took my last final. Summer school [was] officially over." The claimant stated in a posting to this Facebook page, dated September 13, 2013 that she wanted to say

thanks to everyone who came out to the PinkDivas fashion show today. There [were] several pictures posted to this page, dated September 12, 15, and 21, 2013 which show[ed] the claimant posing in formal wear related to the fashion show. (Exhibit 50F)[.] The PinkDivas UAH Facebook page show[ed] that the fashion show was held on September 12, 2013. It [listed] Cassidy Shelton as a UAH student and founder of the group, and it list[ed] Terrence Burroughs as the Vice President. (Exhibit 53F)[.] Ve Spencer's Facebook page show[ed] a post dated July 17, 2013 which show[ed] the claimant and her mother posing for a picture at the Essence Fest day in the park in New Orleans, Louisiana. (Exhibit 60F)[.] Another picture posted to Ve Spencer's Facebook page, dated July 17, 2013 show[ed] a picture of the claimant posing with a young man and [was] described as PinkDivas President and Vice President supporting the CTCA Essence Fest CF Drive. (Exhibit 61F)[.] A posting to Ve Spencer's Facebook page, dated September 12, 2013, show[ed] the claimant posing with Palmer Williams Jr., who was on one of Tyler Perry's television shows. (Exhibit 67F)[.]

The [ALJ] note[d] that Dr. Nelson completed a statement for the Probate Judge of Madison County on September 17, 2013, at around the same time as the PinkDivas Fashions show in which she was involved as Founder and President of that group. In that statement, [Dr. Nelson] stated that the claimant was mentally impaired due to post traumatic stress disorder and [that Ms. Shelton] was incapable of taking care of her affairs and property and she needed a responsible person to look after her affairs. . . . Moreover, despite Dr. Nelson's statement in September 2013 that the claimant [was] not capable of managing her affairs, he specifically noted during the examination in April 2013 that [Ms. Shelton's] judgment and reliability [were] good. [Dr. Nelson] noted in July 2013 that [Ms. Shelton's] judgment and insight [were] developmentally appropriate; that is, appropriate for a person of [Ms. Shelton's] age.

A February 7, 2014 posting to Ve Spencer's Facebook page, dated February 7, 2014, show[ed] [Ms. Shelton] and her mother with 6 other people at the Atlanta Love and Hip Hop event supporting St. Jude's. (Exhibit 63F)[.] However, one week later, on February 14, 2014, [Ms. Shelton's] mother told Dr. Nelson that the claimant was having hallucinations and was unable to go to school. (Exhibit 17F)[.] Dr. Lee completed a mental residual functional capacity assessment on February 20, 2014 in which he rated [Ms. Shelton] as being severely limited in multiple areas. (Exhibit 16F)[.] However, a profile picture posted to the Facebook page of Ms. Diva Shelton

evidence in the record supports the weight the ALJ gave to the treating physicians' opinions based on the conflicting evidence produced by the CDIU investigation.

The ALJ gave Dr. Lee's medical opinion that Ms. Shelton had severe mental limitations "little evidentiary value" because Dr. Lee treated Ms. Shelton

---

Wallace, dated March 14, 2014, show[ed] the claimant dressed in formal wear posing on a sofa. (Exhibit 54F)[.]

Ms. Matlock stated in a letter dated March 25, 2014 that [Ms. Shelton] was hearing voices and was unable to return to school. (Exhibit 23F)[.] Ms. Jackie Williams stated in the mental residual functional capacity assessment completed on September 11, 2014 that the claimant [was] severely limited in many of the areas related to an individual's ability to perform the mental requirements of work. (Exhibit 25F)[.] Ms. Matlock also completed a similar assessment on that same day. (Exhibit 27F)[.] However, Cassidy Summerhill posted a picture dated June 15, 2014 which show[ed] her and an unidentified male posing in front of a cruise ship. A picture dated June 24, 2014 show[ed] [Ms. Shelton] and her mother posing in dresses in a hallway. (Exhibit 50F)[.] Ve Spencer posted a picture of her and [Ms. Shelton] on August 17, 2014 entitled Family Feud. (Exhibit 63F)[.] Another picture posted to Ve Spencer's Facebook page on August 17, 2014 show[ed] [Ms. Shelton] and several others . . . described as "Cass on the stage of Family Feud." A video was posted to Ve Spencer's Facebook page on August 17, 2014 . . . entitled "Cass plays Steve Harvey's Family Feud." (Exhibit 62F)[.] Cassidy Summerhill posted a picture of herself, her mother, an unidentified woman, and Steve Harvey standing together on the set of Family Feud. This was dated August 27, 2014. (Exhibit 50F)[.] [The ALJ noted] that this type of social activity [was] clearly inconsistent with Ms. Matlock's letter of September 22, 2014 in which she described the claimant as being "profoundly uncomfortable in public." (Exhibit 28F)[.] It [was] also clearly inconsistent with Ms. Jackie Williams' description in her letter of September 26, 2014 that [Ms. Shelton] was unable to go to the restroom without her mother or service dog when she first started treating her[,] and she has made only minimal improvement. Records show[ed] [Ms. Williams] first started treating the claimant in April 2014. (Exhibit 30F)[.]

(Doc. 6-6, pp. 72-74).

only once and because the social media evidence the ALJ discussed in her opinion "show[ed] that [Ms. Shelton] function[ed] at a much higher level" than what Ms. Shelton and Ms. Wallace reported to Dr. Lee. (Doc. 6-6, p. 58). As discussed, substantial evidence supports the ALJ's finding that Ms. Shelton's and Ms. Wallace's reports of Ms. Shelton's mental functioning were inconsistent with social media evidence that showed that Ms. Shelton's mental functioning was not as limited as she reported.

The ALJ also noted that Ms. Shelton "traveled extensively during the period of time she [had] alleged disability" and that Ms. Shelton and Ms. Wallace would not produce Ms. Shelton's passport. (Doc. 6-6, pp. 76-77). The ALJ found that Ms. Shelton's reports of "severe anxiety, withdrawal, fearfulness of others and crowds, paranoia, auditory and visual hallucinations" "would make international travel somewhat difficult." (Doc. 6-6, p. 76). The ALJ also pointed to Ms. Shelton's ski weekend in 2013, trips to New Orleans in July 2013 and West Palm Beach in March 2015, and a cruise in June 2014 as evidence of Ms. Shelton's higher mental functioning and ability to be around crowds. (Doc. 6-6, p. 76).

The ALJ gave substantial weight to Dr. Garner's expert medical opinion based on Dr. Garner's consideration of the evidence in the record, including the evidence from the CDIU investigation. (Doc. 6-6, p. 77). The ALJ considered Dr. Williams's July 2015 opinion that Ms. Shelton and Ms. Wallace might be

enmeshed and the possibility that Ms. Shelton's symptoms "were being produced for secondary gain." (Doc. 6-6, p. 59). The ALJ also discussed Dr. McNulty's assessment that Ms. Shelton had a GAF score of 55, which showed moderate mental and social functioning. (Doc. 6-6, pp. 77-78). The ALJ noted that Ms. Shelton completed a patient health questionnaire for Dr. McNulty in 2016 in which she "denied having any problems with taking care of things at home, getting along with others, or doing work." (Doc. 6-6, p. 78).

Considering the record as a whole, the ALJ had good cause to afford Ms. Shelton's treating physicians' opinions less than substantial weight. Substantial evidence supports the ALJ's finding that the opinions of Ms. Shelton's treating physicians were contrary to the social media evidence in the record, the evidence in the record of Ms. Shelton's academic achievements, and the evidence of Ms. Shelton's travel. Substantial evidence in the record also supports the substantial weight that the ALJ gave Dr. Garner's expert medical opinion.

### *Application of the Eleventh Circuit's Pain Standard*

Ms. Shelton contends that substantial evidence does not support the Appeal Council's pain standard findings. The Appeals Council adopted the ALJ's factual findings in the record, but the Appeals Council did not agree with the ALJ's pain standard evaluation. (Doc. 6-6, pp. 11-12).

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223). If an ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for

doing so." *Wilson*, 284 F.3d at 1225. The Commissioner must accept a claimant's

testimony as a matter of law if the ALJ inadequately discredits the testimony.

*Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r,*

*Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When credibility is at issue, the provisions of Social Security Regulation

16-3p apply. SSR 16-3p states:

> [W]e recognize that some individuals may experience symptoms
> differently and may be limited by symptoms to a greater or lesser
> extent than other individuals with the same medical impairments, the
> same objective medical evidence, and the same non-medical
> evidence. In considering the intensity, persistence, and limiting
> effects of an individual's symptoms, we examine the entire case
> record, including the objective medical evidence; an individual's
> statements about the intensity, persistence, and limiting effects of
> symptoms; statements and other information provided by medical
> sources and other persons; and any other relevant evidence in the
> individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Concerning the ALJ's burden when

discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that
> "the individual's statements about his or her symptoms have been
> considered" or that "the statements about the individual's symptoms
> are (or are not) supported or consistent." It is also not enough . . .
> simply to recite the factors described in the regulations for evaluating
> symptoms. The determination or decision must contain specific
> reasons for the weight given to the individual's symptoms, be
> consistent with and supported by the evidence, and be clearly
> articulated so the individual and any subsequent reviewer can assess
> how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

In evaluating a claimant's reported symptoms, an ALJ must consider:

(i)   [the claimant's] daily activities;

(ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors;

(iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of Soc. Sec.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The Appeals Council found that Ms. Shelton's mental and physical impairments could be expected to produce her symptoms but found that her "statements concerning the intensity, persistence [,] and limiting effects" were "not entirely consistent with the medical evidence and other evidence in the records." (Doc. 6-6, p. 12). In applying the pain standard, the Appeals Council agreed with the ALJ's factual findings, (Doc. 6-6, pp. 10-11), and discussed Ms. Shelton's Crohn's treatment records, (Doc. 6-6, p. 11); Ms. Shelton's daily

activities, (Doc. 6-6, pp. 11-12); Ms. Shelton's mental impairments, (Doc. 6-6, p. 11); and Dr. Garner's medical expert testimony and opinion, (Doc. 6-6, pp. 11-12).  The Appeals Council correctly applied the pain standard, and substantial evidence supports the Appeals Council's pain standard findings regarding Ms. Shelton's mental and physical limitations.

The Appeals Council found that, during periods under review, Ms. Shelton's allegations of disabling physical limitations were inconsistent with treatment record findings that Ms. Shelton's Crohn's disease had been in remission since August 2010.  (Doc. 6-6, p. 11; Doc. 6-12, pp. 60-61).  The Appeals Council cited Ms. Shelton's follow-up records from February 2011 through October 2013 that indicated that Ms. Shelton's Crohn's disease was in remission and controlled with medication.  (Doc. 6-6, p. 11; Doc. 6-12, pp. 43-46, 58-59).  The Appeals Council noted that Ms. Shelton's physical examinations in October 2013 and September 2014 showed that she had a "normal gait and station, extremities, cranial nerves, and deep tendon reflexes" and that she was "well-nourished and developed" with a normal lung, heart, and abdomen examinations. (Doc. 6-6, p. 11; Doc. 6-13, pp. 30-31).  Substantial evidence supports these findings.

The Appeals Council noted that Ms. Shelton graduated from college and traveled internationally during the period under consideration.  (Doc. 6-6, pp. 11-

12).  The Appeals Council also noted Dr. Garner's opinion that Ms. Shelton was functioning at a "much higher level than indicated in treatment records and test scores" based on the social media evidence discussed above.  (Doc. 6-6, p. 12) (citing the ALJ's decision, Doc. 6-6, pp. 69-70).  The Appeals Council pointed to Ms. Shelton's March 2016 questionnaire for Dr. McNulty in which Ms. Shelton "reported that she was not bothered by any problems over [] two weeks."  (Doc. 6-6, p. 12).

The Appeals Council thoroughly considered all the medical evidence in the record and adequately explained its reasons for discounting Ms. Shelton's subjective reports of pain.  Because the Appeals Council properly applied the Eleventh Circuit pain standard, and substantial evidence supports the Council's analysis under this standard, Ms. Shelton is not entitled to relief on this issue.

### *Whether Ms. Shelton's mental impairments met a Listing*

Ms. Shelton argues that the Appeals Council erred by finding that she did not meet Listing 12.03 for Schizophrenia or Listing 12.15 for trauma and stressor-related disorders.  (Doc. 6-10, pp. 94-95).  The Court is not persuaded.

The Appeals Council agreed with the ALJ that Ms. Shelton did not have a physical or mental impairment or a combination of impairments that met or equaled a Listing.  (Doc. 6-6, p. 12, 13).  As discussed, the ALJ and Appeals Council had good cause to give Ms. Shelton's treating physicians' opinions that

Ms. Shelton had severe mental impairments less than substantial weight. Like the ALJ, the Appeals Council gave substantial weight to Dr. Garner's medical expert opinion that Ms. Shelton's mental impairments did not meet a Listing because Dr. Garner "had the opportunity to review all the evidence." (Doc. 6-6, p. 12) (citing the ALJ's decision, Doc. 6-6, p. 77). Substantial evidence supports the substantial weight the ALJ and the Appeals Council gave to Dr. Garner's medical expert opinion, including her opinion that Ms. Shelton's mental impairments do not meet a Listing.

## CONCLUSION

For the reasons discussed above, because substantial evidence supports the Appeals Council's decision, the Court affirms the decision of the Commissioner of Social Security.

**DONE** and **ORDERED** this September 2, 2025.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE